UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
AMERICAN TECHNICAL CERAMICS CORP.       :
and AVX CORPORATION,                    :
                                        :
                    Plaintiffs,         :    **MEMORANDUM AND ORDER**
                                        :
     -against-                          :    2:14-CV-6544
                                        :    (KAM) (GRB)
PRESIDIO COMPONENTS, INC.,              :
                                        :
                    Defendant.          :
                                        X
---------------------------------------

**MATSUMOTO, United States District Judge:**

          Plaintiffs American Technical Ceramics Corporation

("ATC") and AVX Corporation (collectively, "ATC" or

"plaintiffs") commenced this action against defendant Presidio

Components, Inc. ("Presidio" or "defendant"), alleging

infringement by Presidio of the following ATC patents:  United

States Patent No. 6,144,547 ("the '547 Patent"), United States

Patent No. 6,337,791 ("the '791 Patent"), and United States

Patent No. 6,992,879 ("the '879 Patent") (collectively, "the

patents-in-suit").  Plaintiffs seek a finding that Presidio

willfully infringed on the patents-in-suit, and injunctive

relief prohibiting Presidio from engaging in further

infringement.  Plaintiffs also seek damages from the alleged

infringement, including attorneys' fees and costs.

Presently before the court are the parties'
submissions for claim construction of nine terms recited in the
'547 and '791 Patents.  The parties do not dispute any claim
terms in the '879 Patent.

## BACKGROUND

ATC is a wholly-owned subsidiary of the publicly
traded AVX Corporation, and is based in Huntington Station, New
York.  Presidio is a privately-owned company based in San Diego,
California.  Both parties are manufacturers of electrical
devices including capacitors.  Capacitors are electronic
components that store and release energy within a circuit, and
are used in a variety of electrical systems, including consumer
electronics, mobile phones, and computer hard drives.
Typically, a capacitor is comprised of two parallel metal plates
separated by a non-conductive, insulating material, known as a
"dielectric."

The patents-at-issue relate to "multilayer ceramic
capacitors" ("MLCCs").  Like other types of capacitors, MLCCs
are mounted to circuit boards to store and release energy within
a circuit.  MLCCs are created through the combination of
multiple capacitors by stacking several layers of conductive and
non-conductive (i.e., dielectric) material; in the present case,

the dielectric material is ceramic.  Both ATC and Presidio make and sell MLCCs.

ATC commenced the instant action on November 6, 2014, alleging that Presidio's "surface mount" MLCCs, specifically, the "Surface Mount Buried Broadband Capacitors" and the "Surface Mount Buried Single Layer Capacitors," infringe the '547, '791, and '879 Patents.  (*See* ECF No. 1, Complaint, at ¶¶ 10-13, 17-20, 24-26.)  The parties submitted a "Joint Disputed Claim Terms Chart" on November 20, 2015, setting forth the claim terms in dispute with the parties' respective constructions of those claims.  (*See* ECF No. 48, Joint Disputed Claim Terms Chart Pursuant to Local Patent Rule 11.)  A claim construction, or *Markman*, hearing was held before this court on August 31, 2016, at which the parties presented oral arguments and expert testimony to further explain their respective constructions of the claims in dispute.  (Transcript of Civil Hearing on August 31, 2016.)

## DISCUSSION

Before reaching a determination on an alleged infringement, the court must first construe a patent's claim limitations to define the meaning and scope of the invention from which a patentee has a right to exclude others.  *See*

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
381 F.3d 1111, 1115–16 (Fed. Cir. 2004).  In order to
effectively protect an inventor's rights, patents must describe
the exact scope of an invention.  *See Markman v. Westview
Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("[A] patent must
describe the exact scope of an invention and its manufacture to
secure to [the patentee] all to which he is entitled, [and] to
apprise the public of what is still open to them.") (internal
quotations omitted)(alterations in original).  Through the
patent claims, a patentee seeks to define the precise scope of
the invention and thus the scope of the patentee's right to
exclude others from making, using, or selling the patented
invention.  *Id.*

### I.  Legal Standards For Claim Construction

Construction of a patent, including the terms within
its claims, must be determined by the court.  *See Teva
Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835
(2015) ("'[T]he construction of a patent, including terms of art
within its claim,' is not for a jury but 'exclusively' for 'the
court to determine.'") (quoting *Markman*, 517 U.S. at 390).  The
law of the Federal Circuit governs issues of substantive patent
law, which includes claim construction.  *See Spiel Assocs., Inc.*

*v. Gateway Bookbinding Sys., Ltd.*, No. 03-cv-4696, 2007 WL
6148516, at *3 (E.D.N.Y. June 21, 2007) ("The construction of
patent terms is a question of law to be determined by the
Court, applying the law of the Federal Circuit to issues of
substantive patent law.") (citing *Markman v. Westview
Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*,
517, U.S. 370 (1996)). In addition to its protective function
with respect to the patentee, claim construction is significant
in providing proper notice to the public as to what inventions
are and are not covered. *See Markman*, 517 U.S. at 373; *see also
Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1311
(Fed. Cir. 1999) (discussing the need to place the public on
notice as to what inventions are and are not covered by the
patent at issue).

In deciding matters of claim construction, district
courts have discretion regarding the procedure by which to reach
a final determination. *See Ballard Med. Prods. v. Allegiance
Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001)
("District courts have wide latitude in how they conduct the
proceedings before them, and there is nothing unique about claim
construction that requires the court to proceed according to any
particular protocol. As long as the trial court construes the

claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best."). In addition, the court need only construe disputed claims "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Ballard Med. Prods.*, 268 F.3d at 1358 ("If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all the other issues presented by the parties."). Further, the court is not required to construe every limitation present in a patent's asserted claims. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

Although courts maintain discretion over claim construction procedure, the law surrounding claim construction is well-settled. Courts must construe patent claims "objectively," *Vivid Techs.,* 200 F.3d at 803, by seeking to accord a claim the meaning it would have to a "person of ordinary skill in the art at the time of the invention*." Innova/Pure Water, Inc.*, 381 F.3d at 1116. In doing so, a court considers three primary sources within the intrinsic evidence of record: (i) the language of the claims, (ii) the specification,

and (iii) the prosecution history.  *Secure Web Conference Corp.*
*v. Microsoft Corp.*, No. 13-CV-2642, 2014 WL 4954644, at *1
(E.D.N.Y. Oct. 2, 2014) (citing *Vitronics Corp. v. Conceptronic,*
*Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

## A. Claim Language

First, the court looks to the words of the claims
themselves, both asserted and nonasserted, to define the scope
of the patented invention.  *See HowLink Global LLC v. Network*
*Commc'ns Int'l. Corp.*, 561 F. App'x 898, 905 (Fed. Cir. 2014)
(quoting *Vitronics*, 90 F.3d at 1582).  In making such a
determination, the words of the claim are the "controlling
focus."  *Digital Biometrics, Inc.,* v. *Identix, Inc.*, 149 F.3d
1335, 1344 (Fed. Cir. 1998).  In general, the language of a
claim is given its ordinary and customary meaning unless a
distinct definition is employed in the specification or
prosecution history.  *See id.* (citing *York Prods., Inc. v.*
*Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572 (Fed.
Cir. 1996) ("Without an express intent to impart a novel meaning
to claim terms, an inventor's claim terms take on their ordinary
meaning.")).  The ordinary and customary meaning of a claim term
is that which one of "skill in the art at the time of the

invention" would understand. *Innova/Pure Water,* 381 F.3d at

1116; *see also InTouch Techs, Inc. v. VGO Commc'ns Inc.*, 751

F.3d 1327, 1339 (Fed. Cir. 2014) ("Generally, a claim term is

given the ordinary and customary meaning as understood by a

person of ordinary skill in the art at the time of invention.");

*Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323,

1332 (Fed. Cir. 2001) ("Throughout the construction process, it

is important to bear in mind that the viewing glass through

which the claims are construed is that of a person skilled in

the art.").

## B. Specification

Next, the court looks at a patent's specification, as

"[c]laims must be read in view of the specification, of which

they are a part." *Markman,* 52 F.3d at 979. The specification

may assist in the court's determination of whether the inventor

intentionally used any terms in the claims in a manner

inconsistent with their ordinary meaning; however, this

intention must be clear. *See Vitronics*, 90 F.3d at 1582 ("[A]

patentee may choose to be his own lexicographer and use terms in

a manner other than their ordinary meaning, as long as the

special definition of the term is clearly stated in the patent

specification or file history."). If a patentee selects a meaning distinct from that which the claim terms would otherwise have to a person of ordinary skill in the art, the different meaning must be set out in the specification in a manner sufficient to give one of ordinary skill notice of the change from the usual meaning. *Innova/Pure Water*, 381 F.3d at 1117.

### C. Prosecution History

Third, the court may consider the prosecution history of the patent, if it is in evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005). A patent's prosecution history contains a complete record of all the proceedings before the United States Patent and Trademark Office ("USPTO"), including any express representations made by the applicant regarding the scope of the claims. As such, the prosecution history provides evidence of how the USPTO and the inventor understood the patent, and the record before the USPTO can be of critical significance in determining the meaning of the claims. *See Phillips*, 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.") (citations omitted); *see also Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576

(Fed. Cir. 1995) ("The prosecution history limits the
interpretation of claim terms so as to exclude any
interpretation that was disclaimed during prosecution.")
(citations omitted).

### D. Extrinsic Evidence

Finally, while it is well-settled that courts should
look primarily to the intrinsic evidence of record in resolving
a claim construction dispute, extrinsic evidence may be
considered when ambiguity remains after consulting the intrinsic
evidence. *Vitronics*, 90 F.3d at 1583. Extrinsic evidence,
however, is "less significant than the intrinsic record in
determining the legally operative meaning of claim language."
*Secure Web Conference Corp.*, 2014 WL 4954644, at *2 (citing
*Phillips,* 415 F.3d at 1317). Indeed, in permitting
consideration of extrinsic evidence, the Federal Circuit has
cautioned courts not to place too much reliance on extrinsic
evidence and too little reliance on intrinsic sources. *Id.* at
*2 (citing *Phillips*, 415 F.3d at 1320). Extrinsic evidence has
been defined to include evidence external to the patent and
prosecution history, such as expert testimony, inventor
testimony, dictionaries, and relevant treatises or articles.

*See id.* at *2 (citing *Phillips*, 415 F.3d at 1317).

The court addresses each of the disputed claims in the '547 Patent and '791 Patent, and construes the claims as described below.

## II. Claim Terms Under Dispute

### A. The '547 Patent

The '547 Patent is entitled "Miniature Surface Mount Capacitor and Method of Making Same," and lists Gennady Retseptor as the sole inventor. The '547 Patent describes "[s]urface mount capacitors […] having ultra-small dimensions of length, width and height," as well as "improved methodology for terminating a capacitor or other surface mount component." ('547 Patent Abstract.) The other surface mount components referenced include "inductors, resistors, fuses and the like." ('547 Patent, at 6:2-5.) ATC and Presidio contest the meaning of five terms in the '547 Patent.

#### 1. "A thin film capacitor device"/"capacitor device"

The '547 Patent refers in the preamble to Claims 1-11 and Claim 12 to "a **thin film capacitor device** for mounting to a surface, said **capacitor device** comprising […]." ('547 Patent,

at 6:12-13.)  Plaintiffs contend that no construction is
required because the term, "a thin film capacitor device" and
"capacitor device" are part of a non-limiting preamble.  (ECF
No. 49, Plaintiffs' Opening Claim Construction Brief ("Pl.
Br."), at 12.)  According to plaintiffs, deleting the phrases "a
thin film capacitor device" and "capacitor device" would not
affect the structure of the invention as described in the claim
body, and as used in the preamble, the terms merely describe
what the claim body sets out as a structurally complete device.
Plaintiff's argument relies on the general rule that "preamble
language is not treated as limiting."  (*Id.*); *See Aspex Eyewear,
Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir.
2012) (citing *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299
F.3d 1336, 1346 (Fed. Cir. 2002)).

Defendant, on the other hand, proposes that the terms
"a thin film capacitor device" and "capacitor device" as used in
the '547 Patent act as a limitation that should be construed to
mean "a capacitor manufactured by thin film deposition onto a
non-pliant substrate."  (ECF No. 54, Defendant's Responsive
Claim Construction Brief ("Def. Br."), at 27.)  Presidio's
argument is primarily based on the "present invention"
principle, which provides that when a patent describes "the

features of the 'present invention' as a whole, this description limits the scope of the invention."  (*Id.* at 18); *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).  Presidio further argues that because Claims 2-11 refer back to "thin film device capacitor" in the preamble of Claim 1, the Claim 1 preamble provides an "antecedent basis" to understand Claims 2-11, and is therefore limiting.  (Def. Br. at 21.)

A patent claim is typically drafted in three parts: the preamble, the transition, and the body.  *See* 3-8 Chisum on Patents § 806[1][b] (2007).  The general rule cited by plaintiffs, that a preamble is not limiting, applies when the patent applicant did not rely on the preamble to define the invention or to distinguish prior art, and the phrase is not necessary to understanding the claim body.  *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 810 (Fed. Cir. 2002); *see also Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1371 (Fed. Cir. 2003) ("[I]f the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.").

By contrast, a preamble limits an invention when it recites essential structure or steps, or when it gives "life, meaning, and vitality" to a claim. *Catalina*, 289 F.3d at 801; *see also NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1306 (Fed. Cir. 2005) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."). In addition, clear reliance on a preamble during patent prosecution also may cause the preamble to act as a limitation on a claim. *See, e.g., Jansen v. Rexall Sundown, Inc.,* 342 F.3d 1329, 1333 (Fed. Cir. 2003).

Here, the court finds that the preamble in the '547 Patent is not limiting and, consequently, that no construction of "a thin film capacitor device" or "capacitor device" is required. Presidio fails to identify any evidence in the intrinsic record that the terms at issue define the invention or are necessary to understand the claim body. Presidio incorrectly asserts that the '547 Patent defines the "present invention" as a "thin film capacitor device"; in fact, the specification broadly refers to the "present invention" as a "surface mount component" or "surface mount capacitor device." (*See* '547 Patent, at 2:11-32.) Presidio relies on a preferred

embodiment in the specification to support its position the "present invention" is "a thin film capacitor device." (Def. Br. at 2.) However, the term "thin film" is only referenced by example in the specification, as evidenced by Retseptor's use of the qualifiers "for example," "typically," and "exemplary." (*See, e.g.*, '547 Patent, at 2:47.) The Federal Circuit has established "that the preferred embodiment does not limit broader claims that are supported by the written description." *Toro Co. v. White Consol. Indus. Inc.,* 199 F.3d 1295, 1301 (Fed. Cir. 1999); *see also Burke, Inc. v. Bruno Indep. Living Aids, Inc.,* 183 F.3d 1334, 1341 (Fed. Cir. 1999) ("[A]n attribute of the preferred embodiment cannot be read into the claim as a limitation."). Moreover, the '547 Patent specification emphasizes that the preferred embodiment "is by way of example only, and is not intended to be limitative of the invention set forth in the appended claims." ('547 patent, 6:8-11.) Thus, there is no indication in the intrinsic record that Retseptor disavowed all embodiments not "thin film."

In addition, the '547 Patent claims recite a structurally complete invention without the preamble language. The term "a thin film capacitor device" is not necessary to give meaning to the claims, nor is it necessary to provide an

15

antecedent basis to understand the claims at issue.  The Federal Circuit has explained that "[w]hen limitations in the *body* of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."  *Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1339 (Fed. Cir. 2003) (emphasis added). That is not the case here.  The term "a thin film capacitor device" appears in the preamble to Claim 1 and the preamble to Claims 2-11.  Thus, the term does not provide an antecedent basis to understand a limitation in the *body* of Claims 2-11 and Claim 12.

Finally, there is nothing in the prosecution history indicating that the preamble language was necessary to understand the claims.  Based on the foregoing analysis, the court finds that the preamble terms "a thin film capacitor device" and "capacitor device" are not limiting, do not define the invention and are not necessary to understand the claim body, and therefore, require no construction.

### 2. "Substantially L-shaped terminations"

All claims of the '547 Patent describe "a device body having small dimensions in length, width and height, and having **substantially L-shaped terminations** located thereon with

16

portions of said terminations extending over a bottom surface of said device body and negligibly over a top surface of said device body . . ." ('547 Patent, at 6:13-18.) Plaintiffs contend that this claim term does not require construction and should be defined according to the term's ordinary meaning. (Pl. Br. at 13.) Defendant, however, argues that this claim should be construed as "[t]erminations having an L-shape," – eliminating the word "substantially" – with the addition of further clarifying language that "terminations that have a U-shape, and terminations that extend around the lateral sides of the device body, are excluded." (Def. Br. at 22-23.) Presidio argues that its proposed construction is necessary for clarity, and specifically, to distinguish the '547 Patent from prior art U-shaped terminations. (Id.)

There are two issues in dispute with respect to the construction of this claim: (1) use of the word "substantially," and (2) whether the term "L-shaped" requires further clarification.

First, with respect to the use of the word "substantially," defendant's suggested construction removes this word, thereby limiting the scope of the claim. Plaintiffs contend that the inclusion of "substantially" indicates that the

terminations may extend, at least partially, onto the device body sides, and that defendant improperly limits the meaning of "substantially L-shaped" by disregarding the modifier "substantially" in order to exclude embodiments having termination material on the top of the device body. (Pl. Br. at 6-7.)

Indeed, it is well-settled that claims must be "interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *see also Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *TouchTunes Music Corp. v. Rowe Int'l Corp.*, 727 F. Supp. 2d 226, 233 (S.D.N.Y. 2010) ("A claim construction that renders claim language superfluous is almost always incorrect.")(citing *Stumbo v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007)). Moreover, words of approximation, such as "generally" or "substantially," are commonly used in patent claims to avoid strict numerical boundary to specific parameters. *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) (citations omitted).

In addition, as discussed above, in giving effect to all terms in a claim, the terms must be read in view of their ordinary meaning, unless a contrary intent is evinced in the specification or prosecution history. *See Markman,* 52 F.3d at 979; *Vitronics,* 90 F.3d at 1582. Here, there is no special definition for "substantially L-shaped" used in the specification or prosecution history that would justify departure from the plain language of the claim. The '547 Patent specification does not define "substantially L-shaped terminations" in a manner inconsistent with the ordinary meaning of the term; the patentee describes "substantially L-shaped terminations" in Claim 1 as "terminations extending over a bottom surface of said device body and negligibly over a top surface of said device body." ('547 Patent, at 6:13-18.)

Moreover, the word "substantially," as used in the '547 Patent, is consistent with its dictionary definition, which may be consulted by the court in determining the "ordinary meaning" of claim language. *See, e.g., Vitronics,* 90 F.3d at 1584 n.6 (Fed. Cir. 1996) ("Judges ... may ... rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

"Substantially" is defined as "being largely but not wholly that which is specified."  (*See* MERRIAM-WEBSTER*, available at* http://www.merriam-webster.com/dictionary/substantially).  Thus, in accordance with the aforementioned principles, the court finds that the word "substantially" should not be excluded and should be given meaning in construing the claim.

Next, the court considers whether the term "L-shaped" requires further clarification.  Looking at the plain language of the claim, the term "substantially L-shaped terminations" suggests structures that are essentially shaped like the letter "L," but with latitude for slight variation from an exact "L" shape.  The court disagrees with defendant's concern that "substantially L-shaped" will not sufficiently distinguish the structure from U-shaped terminations.  Terminations having a U-shape are already excluded by the ordinary meaning of "substantially L-shaped," because a structure with "terminations that extend around the lateral sides" of a device body would not be L-shaped.  The clarifying language suggested by Presidio is therefore unnecessary.

In light of this analysis, the court construes the phrase "substantially L-shaped terminations" in accordance with its ordinary meaning, i.e., as a termination that is

substantially or largely L-shaped, but not wholly L-shaped.

### 3. "Negligibly over a top surface"

The '547 Patent claims all recite that the "substantially L-shaped terminations" extend **"negligibly over a top surface"** of the device body. ('547 Patent, at 6:17-18.) Plaintiffs contend that this claim should be constructed to mean that "a small amount of termination material is formed on a top surface of the device body." (Pl. Br. at 15.) While both parties agree that this definition applies, Presidio argues that additional construction is necessary to clarify that "[t]he amount must also be small in relation to the termination material extending over a bottom surface of the capacitor device body." (Def. Br. at 24.) Plaintiffs argue that this additional limitation is unnecessary because the '547 Patent claims already describe the size relationship between the termination portions extending over the top and bottom surfaces using the "negligibly" and "substantially L-shaped" limitations. (*See* ECF No. 55, Plaintiffs' Reply Claim Construction Brief ("Pl. Repl.") at 5.)

The court finds that the clarification offered through Presidio's proposed construction is not necessary to construe

the disputed claim. The claim already recites that the terminations must be "substantially L-shaped," which by its plain language describes the size relationship between the termination portions (i.e., one that creates the appearance of an "L"). By definition, the top configuration must be smaller than the bottom configuration in order for the top termination portion to extend "negligibly," and for the terminations as a whole to appear "substantially L-shaped."

The court therefore construes the claim "negligibly over a top surface" to mean "a small amount of termination material is formed on a top surface of the device body."

### 4. "Insulating substrate"

Claim 1 of the '547 Patent recites that the capacitor device body includes "an **insulating substrate** having a top surface and a bottom surface." ('547 Patent, at 6:19-20.) Plaintiffs contend that the term "insulating substrate," should be construed to mean "a layer of material used as an insulator in the device body." (Pl. Br. at 16.) Presidio proposes that the term "insulating substrate" as used in the '547 Patent should be construed to mean a "rigid insulating layer." (Def. Br. at 24.) Presidio argues that "rigid" is necessary to the construction

because "the '547 patent utilizes a rigid substrate in all descriptions and embodiments" and "the claimed inventions cannot be accomplished without a 'rigid insulating layer.'" (Id.) Plaintiffs dispute Presidio's assertion that the invention cannot be accomplished without a "rigid" insulating layer and further argue that Presidio improperly imports a "rigidity" requirement into Claim 1 that does not appear in the claim itself. (Pl. Br. at 17.)

In construing "insulating substrate," both parties appear to agree on the meaning of the term "insulating," and effectively equate the word "substrate" to "layer." (*Compare* Pl. Br. at 16 ("a layer . . . used as an insulator") *with* Def. Br. at 24 ("insulating layer").) The court therefore need only determine whether, as Presidio argues, "insulating substrate" should be construed to include the limitation "rigid."

In ascertaining the proper scope of patent claims, "courts must take extreme care […] lest they simultaneously import into the claims limitations that were unintended by the patentee." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003); s*ee, e.g., Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 950, 28 USPQ2d 1936, 1938 (Fed. Cir. 1993) ("It is improper for a court to add extraneous limitations

to a claim, that is limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.") (citation omitted). The danger of improperly importing a limitation is greater when the purported limitation is based upon a term not appearing in the claim. *Amgen*, 314 F.3d at 1325; *see also Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 990, 50 USPQ2d 1607, 1610 (Fed. Cir. 1999) ("[I]f we once begin to include elements not mentioned in the claim in order to limit such claim ..., we should never know where to stop.") (quoting *McCarty v. Lehigh Val. R.R.,* 160 U.S. 110, 116 (1895)).

Here, the word "rigid" does not appear in Claim 1, and the specification does not establish that the "insulating substrate" must be rigid. Further, Claim 5 *does* include the word "rigid" to describe a "layer of insulative material," which demonstrates that inventor Retseptor expressly included "rigid" when he intended it to serve as a limitation on Claim 5 in the '547 Patent. *See Amgen*, 314 F.3d at 1326 ("when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."). Accordingly, the court construes the term "insulating substrate" in a manner

24

consistent with its plain and ordinary meaning, without importing the limiting descriptor, "rigid," into the construction.

### 5. "A device body ... of 0402 or less" and "no greater than 0402"

Claims 3 and 12 of the '547 Patent respectively describe the capacitor device body as **"a size of 0402 or less"** and **"no greater than 0402."** ('547 Patent, at 6:36-37, 6:64.) As set forth in the specification, the "0402" notation refers to the length and width dimensions of the device body. The '547 Patent specification explains that "[a]ccording to industry practice, the size of a surface mount component is generally expressed as a number 'XXYY,' with XX and YY being the length and width, respectively, in hundredths of an inch." ('547 Patent, at 1:16-19.) Height and termination dimensions are expressed separately in the patent. (*See, e.g.*, '547 Patent, at 4:20-28 (referencing standard heights for 0402 capacitors).)

In construing the term "0402," plaintiffs advocate the "XXYY" length and width construction set forth in the '547 Patent ('547 Patent, at 1:16-18), as well as inclusion of a "+ 0.004" tolerance value for these dimensions, as identified in Electronics Industries Association ("EIA") industry standard.

(Pl. Br. at 18.)

By contrast, Presidio proposes that "0402" be construed according to the EIA-198-3 standard, which discloses height, termination width, and gap width dimensions for "0402 case size" that are not expressed in the patent. (Def. Br. at 25-26.) Plaintiffs, however, explain that the '547 Patent does not limit capacitor height to an industry standard, as indicated by references in the '547 Patent to "0402 size capacitors having *less height*." (Pl. Repl. at 6 (quoting '547 patent at 1:27-29.))

As discussed above, courts must take great caution when reading limitations into a patent claim, particularly when such limitations are based on language that does not appear in the patent. *See Amgen*, 314 F.3d at 1325; *see also Johnson Worldwide Assocs.,* 175 F.3d at 990. Because the EIA-198-3 standard advocated by defendant includes height, width, and termination dimensions not referenced in the '547 Patent, Presidio's proposed construction of claim term "0402" is untenable. Further, although the +0.004 tolerance value cited by plaintiffs is an industry standard (*see* Pl. Br. at 18.), the plain language of Claims 3 and 12 does not allow for a tolerance above 0402. ('547 Patent, at 6:37, 6:64 (specifying a "size of

26

0402 *or less*" and "*no greater than* 0402") (emphasis added).)
The court therefore construes the term "0402," in accordance
with the language of the claims, to describe dimensions no
greater than a length of 0.04 inches and a width of 0.02 inches.

## B. The '791 Patent

The '791 Patent is entitled "Capacitor Featuring
Internal Electrode With Pad," and lists Richard Monsorno as the
sole inventor.  The '791 Patent describes an invention "to
provide a capacitor that retains superior high frequency
attributes of the capacitor taught in the [prior Monsorno
patent] while reducing space needed on a mother board."  ('791
Patent, at 1:19-22.)  In particular, the '791 Patent describes
the present invention as having "more than four times the
capacity of those taught in the [prior Monsorno patent] for the
same size unit with the same dielectric thickness."  (Id., at
1:22-25.)  The parties contest the meaning of four terms in the
'791 Patent.

### 1. "Single-layer cap member"

Claim 1 of the '791 Patent describes a "**single-layer
cap member** connected to the first end of the first electrode
layer."  ('791 Patent, at 4:4-6.)  The disputed term, "single-

layer," refers to the number of layers forming each "cap member" recited in Claim 1.  Plaintiffs contend that no construction is required and the plain and ordinary meaning of "single-layer" (i.e., one layer) should apply.  (Pl. Br. at 20.)  Defendant asserts that "single-layer" should be construed to mean "only one conductive material at the end of the dielectric," to avoid ambiguity regarding whether the technique described forms one layer or multiple layers.  (Def. Br. at 26.)

The court finds no support in the record for defendant's argument that "single-layer" should be construed to mean "one material."  First, although "single" and "one" are synonymous, the plain meaning of the word "layer" is different from "material."  Second, the word "layer" appears extensively throughout the '791 Patent, but defendant offers no explanation for why "layer" need not be construed to mean "material" elsewhere.  When construing patent terms, courts "begin with the presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."  *Fin Control Sys. Pty, Ltd. v. OAM, Inc.,* 265 F.3d 1311, 1318 (Fed. Cir. 2001).  Furthermore, "a claim term should

be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). In addition, defendant's concern regarding potential ambiguity with respect to the number of layers is already addressed by use of the word "single-layer," as well as the preceding language describing the single layers forming each cap recited in Claim 1. ('791 Patent, at 3:33 – 4:56.)

Therefore, the court construes "single-layer cap member" in accordance with the plain meaning of "single-layer" as well as its usage in the '791 Patent specification, to mean "one layer."

### 2. "A second electrode layer formed as a pad"

Claims 1 and 2 of the '791 Patent describe "a **second electrode layer formed as a pad** for contact with the second surface of the first dielectric layer." ('791 patent, at 4:13-14, 4:49-50.) Plaintiffs propose that "a second electrode layer formed as a pad" as used in the '791 Patent means "an electrode layer arranged on the external bottom surface of the capacitor." (Pl. Br. at 21.) Defendant, on the other hand, argues that no

construction is needed as there is no requirement that the electrode layer formed as a pad be located on the bottom surface.  (Def. Br. at 26-27.)

Claims 1 and 2 provide no guidance as to any relationship between the location of the pad and the circuit board, nor does the '791 Patent specification.  Absent clear evidence in the intrinsic record, the court turns to the dictionary definition of "pad," which is "something soft used for protection or comfort; cushion."  *See* MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/pad.  The dictionary definition contains no specified orientation of the pad in relation to the other objects that it protects.

The prosecution history of the patent further supports the conclusion that there is no requirement that the pad be located on the bottom surface of the capacitor.  *See Presidio Components, Inc., v. American Technical Ceramics Corp.,* IPR2015-01330, 2015 WL 9599180, at *4 (PTAB December 3, 2015).  In its December 3, 2015 decision, the Patent Trial and Appeal Board stated:

> We find no support, however, for [ATC's] construction requiring the second electrode to be formed only on the 'bottom surface' of the capacitor.  There is nothing in the plain and ordinary meaning of 'pad' to suggest that it can only be formed on the bottom, as

30

opposed to the top, of the capacitor.  Moreover,
[ATC's] proposed construction is deficient insofar as
it fails to provide a frame of reference to determine
which side constitutes the 'bottom.'  (*Id.*)

Accordingly, the court finds that no construction of
the term "a second electrode layer formed as a pad," is
required.

### 3. "Different level of polarity"

Claims 1 and 2 of the '791 Patent describe "the first
electrode layer connectable to a source of electric current so
as to be operable at a **different level of polarity** from that of
the second electrode layer."  ('791 Patent, at 4:16-17, 4:54-
56.)  Plaintiffs contend that no construction is required, and
the plain and ordinary meaning of "different level of polarity"
applies; according to plaintiffs, the plain and ordinary meaning
of the term "different level of polarity" is "opposite level of
polarity."  (Pl. Br. at 23)  Presidio disagrees with plaintiffs'
definition and argues that construction is required.  Presidio
proposes that the term "different level of polarity" should be
construed to mean a "different quantity of the same positive or
negative charge."  (Def. Br. at 15.)

When a term's "ordinary meaning" is subject to
dispute, claim construction requires a court to determine "what

31

claim scope is appropriate in the context of the patents-in-suit." *O2 Micro Int'l Ltd.,* 521 F.3d at 1361. Here, the court must determine whether "different level of polarity" refers to different *charges* (i.e., positive and negative) as plaintiffs assert, or different *quantities* of the same charge (i.e., positive and positive, or negative and negative) as defendant asserts.

The language of the '791 Patent claims and specification provide limited guidance on the meaning of the term "different level of polarity." In resolving the parties' dispute, the court examines the ordinary meaning of the words in the term "different level of polarity," considering each word comprising the phrase in turn and as a whole. The ordinary meaning of "different" is "not of the same kind" or "partly or totally unlike." *See* MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/different. The ordinary meaning of "level" is "an amount of something." *See* MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/level.

The ordinary meaning of the word "polarity" in the physics context is "the condition of having positive and negative charges and especially magnetic or electrical poles."

*See* MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/polarity.  Thus, reference to polarity, by its plain physics meaning, inherently refers to the state of having positive **and** negative charges.  In contrast, defendant appears to rely on the plain meaning of the word "polarities," which is defined as "the particular state either positive **or** negative with reference to the two poles or to electrification." *See* MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/polarities (emphasis added).

Plaintiff and defendant each presented experts who testified to opposing constructions of the term "different level of polarity."  Viewing expert testimony as extrinsic under the well-settled case law, the court finds that plaintiffs' expert testimony is consistent with the plain meaning of "polarity" as it is used in the term "different level of *polarity*," whereas defendant's expert testimony is consistent with the plain meaning of "polarities," which is not referenced in the '791 Patent.  (*See* Declaration of Stanley R. Shanfield, Ph.D., in Support of Plainttiffs' Rely Claim Construction Brief ("Shanfield Reply Decl."); Def. Br. Exhibit 3 ("Randall Decl."); *see also* Transcript of Civil Hearing on August 31, 2016, at 35:2 – 36:3, 103:24 – 106:8.)

In further support of its position, Presidio argues that the claim language specifically includes the word "level," instead of simply referring to "different polarity," and that "level" is rendered superfluous under plaintiffs' proposed construction. (Def. Br. at 15.) The court notes the well-settled principle that claim construction should give effect to all terms of a claim, as discussed above. *See Bicon,* 441 F.3d at 950; *Merck*, 395 F.3d at 1372; *TouchTunes Music*, 717 F. Supp. 2d at 233. The court disagrees with defendant's assertion that plaintiffs' construction renders "level" superfluous, and consequently construes the word "level" as necessary in conveying the concept of different amounts of positive and negative charges, as found in the term "different level of polarity."[1]

The court finds that according to the plain meaning of Claims 1 and 2, the phrase "different level of polarity" refers

---

[1] In further support of its position, Presidio notes that the '879 Patent, also authored by Monsorno, refers to "opposite polarity." ('879 Patent, at 6:37-39.) Presidio argues that had Monsorno intended to refer to positive and negative charges, he would have employed the same term here. (*See* ECF No. 76, Letter in Response to Plaintiff 9/2/2016 Letter by Presidio Components, Inc., at 6.) However, a relationship between two unrelated patents, despite having a common inventor and subject matter, is not sufficient to render arguments regarding one patent equally applicable to the claims of the other patent. *See Abbott Laboratories v. Dey, L.P.*, 287 F.3d 1097, 1105 (Fed. Cir. 2002); *Texas Digital Systems. Inc. v. Telegenix, Inc.* 308 F.3d 1193, 1211 (Fed. Cir. 2002) (citing *Abbott*). The language used in the '879 Patent claims is therefore irrelevant.

to different amounts of positive *and* negative charges.

### 4. "**A margin outward of the first electrode layer**"

Claim 2 of the '791 Patent describes a "second dielectric layer […] on the second electrode surface so that the first dielectric layer and the second dielectric layer combine to describe **a margin outward of the first electrode layer**." ('791 Patent, at 4:38-48.)  Plaintiffs contend that no construction is required, and that the ordinary meaning of "a margin outward of the first electrode layer" should apply without further limitation on where the margin may traverse. (Pl. Br. at 24-25.)  Defendant argues that the term should be construed as "a margin on each end and side of the first electrode layer."  (Def. Br. at 28-29.)

The plain meaning of the term language, "a margin outward of the first electrode layer" indicates a margin that resides outside of the electrode layer, without specifying a particular scope or location at which it should reside.  Through its proposed construction, defendant seeks to impose a requirement that the margins extend outward from each end and each side of the electrode, by comparing the use of the word "margin" in Claim 2 of the '791 Patent with the use of the same

word in Claim 1 of the '791 Patent.  (Def. Br. at 28-29.)
Looking at the language of the claims, Claim 1 describes "a
margin outward of the first electrode layer 'end'" whereas Claim
2 does not contain the word "end" as a modifier, describing only
"a margin outward of the first electrode layer."  ('791 Patent,
at 4:2-3, 4:47-48.)  Defendant argues that the inconsistent use
of the word "end" in the two claims means that each claim must
convey a different scope from the other, and that the absence of
a modifier in the language of Claim 2 means that the Claim 2
margin must extend around the entire electrode layer (i.e., at
each end and each side).  (Def. Br. at 28-29.)

        The court agrees with defendant that the inclusion of
the word "end" in Claim 1 distinguishes its scope from Claim 2,
under the aforementioned principle that words of a claim should
not be construed in a manner that renders them superfluous.  *See
Bicon,* 441 F.3d at 950; *Merck,* 395 F.3d at 1372; *TouchTunes
Music,* 727 F. Supp. 2d at 233.  The court, however, disagrees
with defendant's interpretation that the difference in scope
between the two claims leads to the imposition of a mandate that
the margin described in Claim 2 include each end and each side
of the electrode layer.  Although Claim 1 is not in dispute, the
court has given consideration to its meaning in construing Claim

2.  The court finds that the use of the word "end" in Claim 1 suggests a specific location with respect to the margin described, which is absent from the description of the margin in Claim 2.  However, the court finds that without the word "end," Claim 2 simply describes a margin that may appear on *either* end or side of the electrode, rather than a margin that must appear on each end and each side.  The court therefore construes Claim 2 to describe a margin of unspecified location, in accordance with the ordinary meaning of the claim.

## CONCLUSION

The disputed claims in the '547 Patent and '791 Patent are construed as detailed above.  The parties shall proceed in this litigation in a manner consistent with this opinion and jointly advise the court by letter filed on ECF no later than November 14, 2016 how they intend to do so.

**SO ORDERED.**

Dated:   November 7, 2016
         Brooklyn, New York

                                   /s/
                          _____
                          **Kiyo A. Matsumoto**
                          United States District Judge