UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
AMERICAN TECHNICAL CERAMICS CORP.
and AVX CORPORATION,

     *Plaintiffs*,

   -against-

PRESIDIO COMPONENTS, INC.,

    *Defendant*.
--------------------------------X

**MEMORANDUM & ORDER**

14-CV-6544(KAM)(GRB)

**MATSUMOTO, United States District Judge:**

      Plaintiffs American Technical Ceramics Corp. ("ATC")
and AVX Corporation ("AVX," and together with ATC, "plaintiffs")
initiated the instant action by filing a complaint ("Compl." or
the "complaint," ECF No. 1) on November 6, 2014, alleging
infringement by defendant Presidio Components, Inc. ("Presidio"
or "defendant") of the following patents held by plaintiffs:
United States Patent No. 6,144,547 (the "'547 Patent"), United
States Patent No. 6,337,791 (the "'791 Patent," together with
the '547 Patent, the "patents-in-suit"), and United States
Patent No. 6,992,879 (the "'879 Patent").[1]  (*See generally*
Compl.; *see also* Compl. Ex. 1, ECF No. 1-3 (annexing '547
Patent, '791 Patent, and '879 Patent).)  Plaintiffs seek damages

---

[1]   As discussed more fully in section "Discussion – I.B," plaintiffs are
not proceeding with their action as to claims cancelled by the Patent and
Trademark Appeals Board of the United States Patent and Trademark Office,
specifically all claims of the '879 Patent and claim 1 of the '791 Patent.
(Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, ECF
No. 116-2, at 2 n.1.)

arising from the alleged infringement, judgment that Presidio infringed the patents-in-suit, judgment that Presidio's acts of infringement are willful, an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285, injunctive relief prohibiting Presidio from engaging in further infringement, an accounting, and an award of interest and costs. (Compl. at 5-6.)

Defendant filed an answer and counterclaim ("Ans." or the "answer," ECF No. 22) on January 5, 2015, in which it denied having infringed plaintiffs' patents, (*see* Ans. p. 2 ¶ 7-p. 5 ¶ 26),[2] and asserted affirmative defenses including noninfringement, invalidity of the patents-in-suit, laches, equitable estoppel, and waiver. (*Id.* p. 4 ¶ 27-p. 6 ¶ 34.) Defendant also asserted two counterclaims, the first seeking a declaratory judgment that defendant does not infringe the patents-in-suit and the '879 Patent, (*id.* p. 7 ¶ 7-p. 11 ¶ 10), and the second seeking declaratory judgment that the patents-in-suit and the '879 Patent are invalid. (*Id.* p. 11 ¶ 12-p. 12 ¶ 16.) Plaintiffs filed an answer denying the counterclaims on January 29, 2015. (ECF No. 23.)

Presently before the court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure

---

[2] Because the numbered paragraphs in the answer restart on page six, the court refers to both the paragraph number and the page on which the relevant paragraph appears in citations to the answer.

("Rule") 56.  Plaintiffs' motion, which defendant opposes, seeks summary judgment in its favor as to defendant's affirmative defenses of laches, equitable estoppel, and waiver.  (Notice of Motion, ECF No. 97.)  Defendant's motion, which plaintiffs oppose, seeks summary judgment in its favor that: (1) plaintiffs failed to undertake patent marking, (2) the '879 Patent is invalid, (3) plaintiffs cannot establish lost profit damages, (4) this is not an "egregious" case warranting enhanced damages, (5) the '547 Patent is indefinite, (6) defendant did not infringe the '547 Patent, and (7) defendant did not infringe the '791 Patent.  (Motion for Summary Judgment, ECF No. 94.)

## Background

### I.    The Parties

ATC is a wholly-owned subsidiary of AVX.  (Claim Construction Order ("Cl. Constr. Order"), ECF No. 79, at 2.) ATC, AVX, and Presidio are manufacturers of electrical devices, including capacitors, which are electronic components that store and release energy within a circuit, and are used in a variety of electrical systems, including consumer electronics.  (*Id.*) Capacitors typically consist of two parallel conductive, usually metal, plates separated by a non-conductive, insulating material known as a "dielectric."  (*Id.*)

The patents-in-suit relate to "multilayer ceramic capacitors" ("MLCCs"), which are created through the combination

3

of multiple capacitors by stacking several layers of conductive material and non-conductive, or dielectric, material. (*Id.* at 2-3.) Plaintiffs and defendant make and sell MLCCs. (*Id.* at 3.) Plaintiffs manufacture a product known as the Accu-P capacitor. Plaintiff AVX owns the '547 Patent and ATC is the exclusive licensee. Plaintiff ATC owns the '791 Patent. Defendant manufactures products known as BB capacitors, which plaintiffs contend practice and as such infringe the patents-in-suit.

## II. Procedural History[3]

### A. Claim Construction

Following briefing, the court held a claim construction, or *Markman*, hearing on August 31, 2016, at which the parties presented oral argument and expert testimony to explain their proposed constructions of certain claims in the patents-in-suit. (Cl. Constr. Order at 3.) On November 7,

---

[3] The court notes that the parties' respective briefs, exhibits, and other materials relevant to the instant cross-motions for summary judgment have been filed on the docket more than once. The parties initially sought to file a significant number of documents, including certain memoranda of law regarding the instant cross-motions and certain Local Rule 56.1 statements of undisputed material facts, under seal in their entirety. At oral argument on the instant cross-motions, the court directed the parties to meet and confer regarding their respective papers and, for each document, either file an unredacted version or establish good cause as to why the document, or any portion thereof, should be redacted and/or remain under seal. The parties subsequently narrowed the universe of documents they sought to redact, and, at the court's direction, filed a complete set of their moving papers. Citations to the parties' papers are to the most recently filed, complete set of papers.

2016, the court entered its claim construction order, setting
forth how those disputed terms would be construed.

### 1. The '547 Patent

Of particular relevance to defendant's motion for
summary judgment, the court considered the term "substantially
L-shaped terminations," which appears in all claims of the '547
Patent and describes the appearance and structure of the
terminations that devices practicing the '547 Patent would have.
The court concluded that the term was to be construed "in
accordance with its ordinary meaning, *i.e.*, as a termination
that is substantially or largely L-shaped, but not wholly L-
shaped." (*Id.* at 20-21.) In reaching this construction, the
court rejected defendant's argument that "substantially L-
shaped" would not "sufficiently distinguish the structure from
U-shaped terminations," and instead determined that
"[t]erminations having a U-shape are already excluded by the
ordinary meaning of substantially L-shaped, because a structure
with terminations that extend around the lateral sides of a
device body would not be L-shaped." (*Id.* at 20 (internal
quotation marks omitted).)

Also relevant to defendant's motion, at the claim
construction stage, the court considered the '547 Patent's
statement, recited in each of its claims, that the
"substantially L-shaped terminations" extend "negligibly over a

top surface" of the device body. The court construed

"negligibly over a top surface" to mean "a small amount of

termination material is formed on a top surface of the device

body." (*Id.* at 22.) In reaching this construction, the court

noted that "[b]y definition, the top configuration [of the

termination] must be smaller than the bottom configuration in

order for the top termination portion to extend 'negligibly,'

and for the terminations as a whole to appear 'substantially L-

shaped.'" (*Id.*) The parties did not include the term

"terminations" in the Joint Disputed Claim Terms Chart, (*see

generally* Joint Disputed Claim Terms Chart ("JDTC"), ECF No. 48-

1 (setting forth terms for which parties sought construction and

not including "terminations")), and the parties agree that terms

"not specifically identified" in the chart should be "given

their plain and ordinary meaning."[4]  (Notice of Filing of Joint

Disputed Claim Terms Chart ("JDTC Notice"), ECF No. 48, at 1.)

        The court also construed three other terms appearing

in the '547 Patent's claims, (*see* Cl. Constr. Order at 11-16,

22-27), although the other construed terms are not at issue in

the motions presently before the court.

---

[4]      At the *Markman* Hearing, Dr. Stanley R. Shanfield, expert witness for
plaintiffs, described terminations as "the things at the ends of the
capacitor," and Dr. Michael S. Randall, expert witness for defendant,
testified that the capacitor's electrodes are connected to the termination
end. (*Markman* Hearing Transcript ("*Markman* Tr."), ECF No. 80, at 23:1-10 and
98:17-20.)

### 2.   *The '791 Patent*

The court construed four terms in the '791 Patent's claims, (*see generally* Cl. Constr. Order at 27-37), although none of the '791 Patent's construed terms are at issue in motions presently before the court.

### B.   **Inter Partes Review**

A person who is not the owner of a patent may, under certain circumstances, initiate an *inter partes* review and petition the United States Patent and Trademark Office ("USPTO") to review the patent and cancel it as unpatentable.  35 U.S.C. § 311.  In June of 2015, defendant filed petitions for *inter partes* review with the USPTO challenging the validity of the '547 Patent, the '791 Patent, and the '879 Patent.  (So-Ordered Stipulation to Stay Proceedings, ECF No. 75, at 1-2.)  The Patent Trial and Appeal Board ("PTAB") of the USPTO granted the petition with respect to certain claims of the patents, (*id.* at 2), and on September 14, 2016, pursuant to a so-ordered stipulation, the instant action was stayed pending final written decisions from PTAB.  (*See generally id.*)

On November 30, 2016, PTAB held claim 1 of the '791 Patent and all claims of the '879 Patent unpatentable, and on December 1, 2016, PTAB found all challenged claims of the '547 patent patentable.  (Parties' December 2016 Joint Status Letter

("December 2016 Letter"), ECF No. 82, at 1.)[5] The stay in the
instant action was subsequently lifted, and the parties
proceeded with the instant motions.

## C. The Instant Motions

The parties filed their cross-motions for summary
judgment on August 2, 2017. As set forth in defendant's
memorandum of law in support of their motion for summary
judgment, ("Def. Mem.," ECF No. 120-1), defendant seeks summary
judgment that: (1) plaintiffs failed to mark products practicing
the '547 Patent, and as such the patent marking statute bars
plaintiffs from recovering pre-complaint damages for the '547
Patent; (2) the '879 Patent is invalid as anticipated by prior
art; (3) plaintiffs cannot establish lost profit damages for the
'547 and '791 Patents; (4) plaintiffs cannot establish enhanced
damages for the '547 and '791 Patents under 35 U.S.C. § 284; (5)
the '547 Patent is invalid for indefiniteness; and (6)
plaintiffs cannot establish infringement of the '547 or '791
Patents. (*See generally* Def. Mem.) Plaintiffs oppose
defendant's motions, except that plaintiffs do not oppose

---

[5] The parties have not submitted PTAB's full decisions in connection with
the instant motion. A single page from the PTAB Final Written Decision
holding the '879 Patent unpatentable, containing PTAB's conclusion and
certain decretal language, is attached as Exhibit L to the Expert Report of
Dr. Michael S. Randall (ECF No. 120-8). PTAB's Final Written Decision
pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 with respect to the '547
Patent (the "'547 Decision") was attached as Appendix E to Plaintiffs' Motion
to Strike the Randall Report. (*See* Motion to Strike, ECF No. 85; Final
Written Decision, ECF No. 85-7.)

summary judgment as to availability for enhanced damages with respect to infringement of the '547 Patent. (*See generally* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."), ECF No. 122.)

Plaintiffs' motion for summary judgment seeks summary judgment as to three equitable defenses asserted by defendant in its answer as to the patents-in-suit. As set forth in their memorandum of law, ("Pl. Mem.," ECF No. 116-2), plaintiffs seek judgment that the defenses of laches, equitable estoppel, and waiver are not available to defendant. (*See generally* Pl. Mem.) Defendant opposes the motion and contends that each of these defenses should be available at least in part, though defendant concedes that the laches defense is unavailable as to liability and damages. (*See generally* Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Opp."), ECF No. 117.) Additionally, at oral argument, defendant stated that its "equitable estoppel defense is not intended to be applicable to the '547 Patent." (Transcript of Oral Argument ("Arg. Tr."), ECF No. 113, at 13:5-7.)

## Legal Standard

"The court applies the same summary judgment standards to patent infringement matters as it does to motions involving other types of claims." *Mich & Mich. TGR, Inc. v. Brazabra, Corp.*, 128 F. Supp. 3d 621, 629 (E.D.N.Y. 2015), *aff'd sub nom.*

*Mich & Mich TGR, Inc. v. Brazabra Corp.*, 657 F. App'x 971 (Fed. Cir. 2016) (citations omitted). "When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of substantive patent law," *id.* at 631 (citations omitted), as well as to procedural issues that are "intimately involved in the substance of enforcement of the patent right." *Id.* (quoting *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1303 (Fed. Cir. 2001)). Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* at 629 (quoting Fed. R. Civ. P. 56(c)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). For summary judgment purposes, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

10

*Anderson*, 477 U.S. at 248; *accord Mich & Mich. TGR*, 128 F. Supp. 3d at 629 (citations omitted).  Additionally, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Mich & Mich. TGR*, 128 F. Supp. 3d at 629 (citation omitted).

In ruling on a motion for summary judgment, the court's function is only to "determine whether there is a genuine issue for trial," not to "weigh the evidence and determine the truth of the matter."  *Anderson*, 477 U.S. at 249. Further, the court must "view the evidence presented in a light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party."  *Mich & Mich. TGR*, 128 F. Supp. 3d at 630 (quoting *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 209 (E.D.N.Y. 2009)) (omission in quoted material).  "The movant has the burden of showing that there is no genuine issue of [material] fact." *Anderson*, 477 U.S. at 256.  The nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment, *id.* at 257, though making such a showing requires "specific facts showing that there is a *genuine issue for trial*," not merely "that there

is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  The nonmoving party may not rest only on the pleadings, and "[e]ach statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by [Rule] 56(e) and Local Civil Rule 56.1(d)." *Mich & Mich. TGR*, 128 F. Supp. 3d at 630 (citations omitted).

## Discussion

I.   **Defendant's Motion for Summary Judgment**

A.   **Patent Marking**

Defendant seeks to limit the availability of damages to plaintiffs under the patent marking statute, codified at 35 U.S.C. § 287.  (Def. Mem. at 2-4.)  "The patent marking statute limits recoverable damages where a patentee fails to mark her patented products," and "[w]here a patentee does not appropriately mark her products, she may not recover damages for infringement occurring before notice to the infringer." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1378 (Fed. Cir. 2013) (citing 35 U.S.C. § 287).[6]  The

---

[6]      35 U.S.C. § 287(a) provides as follows:
         Patentees, and persons making, offering for sale, or
         selling within the United States any patented article for
         or under them, or importing any patented article into the
         United States, may give notice to the public that the same

statute is only triggered when articles that practice a patent are actually sold into the marketplace, and does not limit damages where a patent holder (or licensee) does not actually sell products practicing the relevant patent into the marketplace. *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002) ("The recovery of damages is not limited [by 35 U.S.C. § 287] where there is no failure to mark, *i.e.*, where the proper patent notice appears on products or where there are no products to mark." (citation omitted)), *abrogated on other grounds by Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Furthermore, the patent marking statute does not limit damages for a period "during which the marking statute is not triggered, even if it later is triggered and the patentee fails to mark." *WiAV Sols. LLC v. Motorola, Inc.*, 732 F. Supp. 2d 634, 640 (E.D. Va. 2010).

---

is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

The Federal Circuit recently clarified parties'
relative burdens as to marking. "[A]n alleged infringer who
challenges the patentee's compliance with § 287 bears an initial
burden of production to articulate the products it believes are
unmarked 'patented articles' subject to § 287." *Arctic Cat Inc.
v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1368 (Fed.
Cir. 2017). This initial burden of production, which is not a
burden of persuasion or proof, is a "low bar," and the alleged
infringer "need only put the patentee on notice that he or his
authorized licensees sold specific unmarked products which the
alleged infringer believes practice the patent." *Id.* "Once the
alleged infringer meets its burden of production, however, the
patentee bears the burden to prove the products identified do
not practice the patented invention." *Id.* The patentee must
meet its burden of proving compliance by a preponderance of the
evidence. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437,
1446 (Fed. Cir. 1998).[7]

---

[7] The court acknowledges that some uncertainty as to the parties'
relative burdens of proof may have existed at the time briefing on the
instant motion closed, as the *Arctic Cat* case that clarified the issue was
not decided until December 7, 2017. 876 F.3d at 1350. Nevertheless, the
Federal Circuit decision in *Nike, Inc.*, 138 F.3d 1437, which both parties
cite in their respective papers, (Def. Mem. at 2; Pl. Opp. at 3), states that
the burden of proving compliance with the patent marking statute is on a
plaintiff. *See* 138 F. 3d at 1446 ("The patentee bears the burden of proving
compliance by a preponderance of evidence."). Prior Federal Circuit
precedent also clearly states that the burden of proof is on the plaintiff to
prove compliance with the patent marking statute. *See Maxwell v. J. Baker,
Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) ("As the patentee, Maxwell had the
burden of pleading and proving at trial that she complied with the statutory
[marking] requirements." (citations omitted)) The court therefore concludes

Defendant contends that plaintiffs' Accu-P capacitor practices the '547 Patent such that the patent marking statute is triggered. (Def. Mem. at 3.) Defendant has therefore "put the patentee on notice that he or his authorized licensees sold specific unmarked products which the alleged infringer believes practice the patent" and met its burden of production as to patent marking. *Arctic Cat*, 876 F.3d at 1368.

There is no dispute that plaintiffs have offered for sale and sold, and continue to offer for sale and sell, Accu-P capacitors. (Def. Mem. at 3; Defendant's Statement of Material Facts ("DSMF"), ECF No. 120-2, ¶ 11; Plaintiffs' Statement of Material Facts ("PSMF"), ECF No. 122-1, ¶ 11.) Further, plaintiffs do not contend that they actually marked any products defendant has identified with the '547 Patent, or otherwise gave notice of the '547 Patent to defendant, and instead contend that the patent marking statute is wholly inapplicable here because "disputed issues of fact exist as to whether the Accu-P products practice the '547 Patent." (*See* Pl. Opp. at 2-6.) Therefore, to prevail on summary judgment as to patent marking, defendant must establish that, when the record evidence is viewed in the light most favorable to plaintiffs and all reasonable inferences are drawn in their favor, no genuinely disputed material facts

---

that it is appropriate to decide defendant's summary judgment motion as to patent marking on the record before it.

remain and plaintiffs cannot meet their burden to establish by a preponderance of the evidence that plaintiffs' Accu-P capacitors do not practice the '547 Patent.

Defendant argues that plaintiffs' interrogatory responses admit that various Accu-P products practice the '547 Patent. (Def. Mem. at 3.) Plaintiffs' interrogatory responses state that various Accu-P capacitors may, due to manufacturing tolerances, practice one or more claims of the '547 Patent. More specifically, due to manufacturing tolerances, Accu-P capacitors in case sizes 0402 and 0201, which have been offered for sale in the United States since 1999 and 2002, respectively, "may embody at least one claim" of the '547 Patent. (Plaintiffs' Supplemental Responses to Interrogatories 2 and 10, DSMF Ex. D, ECF No. 120-6, at 6) The same is true for Accu-P capacitors in case sizes 01005, which have been offered for sale since at least July 2012. (*Id.* at 7.) Additionally, plaintiffs state in a supplemental response to the same interrogatory that "Accu-P capacitors in size 01005, 0201, or 0402 manufactured with a B1 termination greater than 0.00 millimeters practice at least one claim" of the '547 Patent. (*Id.* at 8.)

Plaintiffs, for their part, point to evidence that, if true, would establish that they do not measure the B1 termination size in the ordinary course of business and thus lack sufficient knowledge to determine whether their Accu-P

16

products practice the '547 Patent.  (*See* Pl. Opp. at 4 (citing interrogatory response and deposition testimony).)

Defendant also submits the expert report of Dr. Michael S. Randall (the "Randall Report," DSMF Ex. F, ECF No. 120-8), which includes an opinion that several Accu-P capacitors practice numerous claims of the '547 Patent and notes that plaintiffs have not submitted any rebuttal evidence.  (Def. Mem. at 3.)  Dr. Randall concluded that the Accu-P capacitor with part number 02015J1R0PBSTR practices claims 1-5, 10-13, and 18 of the '547 Patent, (Randall Report ¶ 603), and that the Accu-P capacitors with part numbers 02013J2ROABSTR and 0201ZK6R8BBSTR practice claims 1-5, 12, and 13 of the '547 Patent.  (*Id.*)[8]  Dr. Randall's report sets forth the bases for these conclusions in detail.  (*See id.* ¶¶ 603-39.)  Each of the capacitors Dr. Randall analyzed has a size of 0201.  (*Id.* ¶ 603.)

Plaintiffs' expert, Dr. Stanley R. Shanfield, has not disputed Dr. Randall's opinion that certain Accu-P capacitors practice multiple claims of the '547 Patent.  (PSMF ¶ 15; DSMF ¶ 15.)  Nor have plaintiffs submitted any evidence establishing that the products at issue do not practice multiple claims of the '547 Patent.  Instead, plaintiffs contend that Dr. Randall's opinion is "internally inconsistent in at least two ways."  (Pl.

---

[8]     Dr. Randall did not analyze the 02013J2ROABSTR and 0201ZK6R8BBSTR capacitors to determine whether they practice claims 10, 11, or 18.  (Randall Report ¶ 603.)

Opp. at 5.)  First, Dr. Randall's report indicates that Dr. Randall did not analyze Accu-P products in the width dimension even though, in the context of seeking to establish noninfringement by defendant's BB capacitors, Dr. Randall states that the products must be examined in the length and width dimensions.  (*Id.* at 5-6.)  Second, Dr. Randall simultaneously opines that the term "substantially L-shaped" is indefinite and applies the term in opining that plaintiffs' Accu-P products practice the '547 Patent.  (*Id.* 6.)  In other words, in opposing summary judgment on patent marking, plaintiffs submit arguments about the weight of defendant's evidence, rather than evidence of their own to establish a genuine dispute of material fact regarding defendant's showing of unmarked patented articles subject to 35 U.S.C. § 287.  *Arctic Cat*, 876 F.3d at 1368.

Merely calling into question the validity of Dr. Randall's opinion that plaintiffs' products practice the '547 Patent, however, is insufficient to defeat summary judgment. Here, defendant has put plaintiffs on notice of specific products that defendant contends practice the '547 Patent. Therefore, the burden has shifted to plaintiffs to "prove that the products identified do not practice the patented invention." *Arctic Cat*, 876 F.3d at 1368.  Because a party opposing a properly submitted motion for summary judgment "need only present evidence from which a jury might return a verdict in

[its] favor" to prevail, *Anderson*, 477 U.S. at 257, plaintiffs here need only come forward with evidence showing that a reasonable finder of fact could conclude, by a preponderance of the evidence that the products defendant has identified do not practice the '547 Patent. Making such a showing requires "specific facts showing that there is a *genuine issue for trial*." *Caldarola*, 298 F.3d at 160 (emphasis in original) (quoting *Matsushita Electric Industrial*, 475 U.S. at 586-87).

Plaintiffs, however, have not come forward with any evidence, and disputing the significance of the evidence with which defendant has presented, including plaintiffs' admissions and the Randall Report, does not suffice to show existence of a genuine issue for trial. There is, therefore, no information in the record upon which a reasonable finder of fact could conclude, by a preponderance of the evidence, that the Accu-P products do not practice the '547 Patent.

To summarize, defendant has satisfied its burden of production and put plaintiffs on notice that defendant believes plaintiffs have been selling products that practice the '547 Patent since 1999, when plaintiffs began selling Accu-P capacitors in case size 0402. Plaintiffs have failed to come forward with any evidence from which a reasonable finder of fact could determine that the products defendant identified do not practice the '547 Patent. Indeed, plaintiffs have admitted the

relevant Accu-P products have been sold since 1999 and may practice the '547 Patent. Defendant is therefore entitled to summary judgment as to plaintiffs' claim for pre-suit damages for infringement of the '547 Patent from 1999 onward.[9]

## B.   Validity and Mootness

Defendant seeks summary judgment that the '879 Patent was anticipated by prior art. (Def. Mem. at 4.) Plaintiffs counter that defendant's motion for summary judgment is moot as to the invalidity of the '879 Patent because the USPTO cancelled the patent in the *inter partes* review proceedings. (Pl. Opp. at 6.) The parties do not dispute that the '879 Patent was cancelled in its entirety as part of the *inter partes* review initiated by defendant. (*See* December 2016 Letter, ECF No. 82, at 1.)

When a patent is cancelled, suits based on it must be dismissed. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1338 (Fed. Cir. 2013) ("[T]he 1928 amendment [to the patent reissue statute] did nothing to change the rule that

---

[9]    The court notes that at oral argument, plaintiffs stated, that "[i]t can't be . . . that [defendant's products] don't infringe [the '547 Patent] and the Accu-P[] [products] practice it." (Arg. Tr., ECF No. 113, at 39:2-13.) In other words, if the relevant Accu-P products practice the '547 patent, the accused products infringe it, and if the Accu-P products do not practice the '547 Patent, the accused products do not infringe it. In light of this, it is unclear why plaintiffs oppose summary judgment on the patent marking issue. The instant action is based on plaintiffs' contention that the accused products do infringe the '547 Patent, yet in opposing defendant's motion for summary judgment, plaintiffs argue for an outcome that, under their own theory of the case, is not consistent with their infringement claim.

suits based on cancelled claims must be dismissed.")  In the
*Frenesius USA* case, the Federal Circuit addressed a situation in
which an alleged infringer brought a declaratory judgment action
seeking invalidation of a patent.  *Id.* at 1331.  The patentee
counterclaimed for infringement and, while the litigation was
pending and on remand from a Federal Circuit affirmance of the
district court's determination that the relevant patent claims
were not invalid, the USPTO determined that all asserted claims
were invalid.  *Id.* at 1331-32.  The district court nevertheless
entered judgment against the plaintiff/alleged infringer on the
defendant's counterclaim, but on review, the Federal Circuit
vacated the district court judgment and remanded with
instructions to dismiss on the grounds that, "in light of the
cancellation of the asserted claims . . . [the patentee] no
longer ha[d] a cause of action."  *Id.* at 1332.

The Federal Circuit's decision in *Frenesius USA* makes
clear that, where a patent is invalidated, the patentee no
longer has a cause of action.  *Id.*  The court therefore agrees
with plaintiffs that the motion for summary judgment as to the
'879 Patent's invalidity is moot, but notes that plaintiffs have
not formally dismissed count 2 of the complaint, which alleges
infringement of the '879 Patent, or their claims for
infringement of claim 1 of the '791 Patent, which was also
invalidated in the *inter partes* review proceedings.

Defendant contends that its motion for summary judgment as to the '879 Patent is not moot because "[p]laintiffs' enforcement of patent claims they knew were invalid, because their own products anticipated those claims, is relevant to Presidio's claim that this lawsuit has been pursued by [p]laintiffs in bad faith." (Defendant's Reply in Support of Motion for Summary Judgment ("Def. Repl."), ECF No. 124, at 2.) The court notes that nothing in the cases defendant cites suggests that summary judgment is appropriate where a patent has been invalidated. Instead, the cases cited by defendant concern awards of attorneys' fees for alleged improper conduct. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1299 (Fed. Cir. 2004) (reviewing denial of Rule 11 sanctions and attorneys' fees, and determination as to whether case was exceptional under 35 U.S.C. § 285); *Rohm & Haas Co. v. Crystal Chem. Co.*, 736 F.2d 688, 689 (Fed. Cir. 1984) (considering requests for fees and costs on appeal pursuant to 35 U.S.C. § 285 and Fed. R. App. Proc. 39, respectively).

Accordingly, the court will deny as moot this portion of defendant's motion for summary judgment because the '879 Patent and claim 1 of the '791 Patents are invalid. Instead, the court dismisses plaintiffs' claim for infringement of the '879 Patent, and claim 1 of the '791 Patent because "suits based on cancelled claims must be dismissed." *Fresenius USA*, 721 F.3d

at 1338 (Fed. Cir. 2013).  This dismissal is without prejudice
to defendant's ability to raise any arguments relating to the
invalidity of the '879 Patent or claim 1 of the '791 Patent in
arguing that the instant action was brought in bad faith should
this action reach the stage in proceedings at which such an
argument would be appropriate.

### C.    Lost Profits Damages

Defendant seeks summary judgment as to plaintiffs'
claim for lost profit damages.  (Def. Mem. at 4-11.)  "To
recover lost profits a patentee must show that 'but for'
infringement it reasonably would have made the additional
profits enjoyed by the infringer."  *Micro Chem., Inc. v.
Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) (citing *King
Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995);
*accord BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1
F.3d 1214, 1218 (Fed. Cir. 1993) ("To recover lost profits as
opposed to royalties, a patent owner must prove a causal
relation between the infringement and its loss of profits. The
patent owner must show that 'but for' the infringement, it would
have made the infringer's sales." (citing *Water Technologies
Corp. v. Calco Ltd.*, 850 F.2d 660, 671 (Fed. Cir. 1988), *cert.
denied*, 488 U.S. 968 (1988))).

In proving lost profits damages, a patentee may use
"any method showing, with reasonable probability, entitlement to

lost profits 'but for' the infringement." *Micro Chemical*, 318 F.3d at 1122 (citations omitted). Once the patentee establishes the reasonableness of the inference that it has lost profits as a "but for" result of infringement, "the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Id.* (citation omitted). Importantly, "[a]n award of lost profits may not be speculative. Rather the patent owner must show a reasonable probability that, absent the infringement, it would have made the infringer's sales." *BIC Leisure Products*, 1 F.3d at 1218 (citation omitted).

Courts generally recognize two methods for showing "but for" causation: the four factor test articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978) and the "two-supplier market" test. *Micro Chemical*, 318 F.3d at 1122. Under the *Panduit* test, "[t]o obtain as damages the profits on sales he would have made absent the infringement, *i.e.*, the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit*, 575 F.2d at 1156.

"[U]nder the two-supplier test, a patentee must show: 1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that

were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales." *Micro Chemical*, 318 F.3d at 1124 (citations omitted).  The two-supplier test thus essentially "collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor."  *Id.*

"The proper starting point to identify the relevant market is the patented invention. The relevant market also includes other devices or substitutes similar in physical and functional characteristics to the patented invention. It excludes, however, alternatives 'with disparately different prices or significantly different characteristics.'"  *Id.* (quoting *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1356 (Fed. Cir. 2001)). Importantly, "[i]f the patentee shows two suppliers in the relevant market, capability to make the diverted sales, and its profit margin, that showing erects a presumption of 'but for' causation."  *Id.* at 1125.

Once the patentee establishes the existence of a two-supplier market and concomitant presumption of "but for" causation, the "burden of going forward then shifts to the infringer," though the "burden of persuasion remains with the patentee."  *Id.*  In such a situation, the infringer "may rebut the presumption [of 'but for' causation] by showing that the patentee reasonably would not have made some or all of the

diverted sales 'but for' the infringement." *Id.* For example, the infringer may rebut the presumption by "showing that it sold another available, noninfringing substitute in the relevant market." *Id.* This situation would arise where "infringing supplier had two available alternatives: one infringing and the other noninfringing." *Id.*

Turning to the parties' contentions, and applying the *Panduit* and *Micro Chemical* factors, defendant first argues that plaintiffs have admitted that they lost sales to third parties, and not solely to defendant, and as such cannot establish "but for" causation. (Def. Mem. at 5-6.) Second, defendant argues that the record establishes that there are noninfringing alternatives in the relevant market. (*Id.* at 6-11.)

Defendant first contends that plaintiffs have admitted in responses to defendant's interrogatories that plaintiffs lost sales to a third party. Defendant's Interrogatory No. 10 asked plaintiffs to "identify every sale lost due to competition with the Accused Products" and, for each sale, the number of units not sold and profits lost. (*Id.* at 5-6; DSMF ¶¶ 24-25.) Plaintiffs responded that "[t]he particular competitive market for the ATC 550 series capacitors is the high-performance, broad high-frequency capacitor market . . . for capacitors having an insertion loss of less than .90 decibels at 40GHz." (Plaintiffs' Supplemental Responses to Interrogatories 10 and 16

("Pls. Supp. Resp. to Interrog. Nos. 10 & 16"), DSMF Ex. L, ECF
No. 120-14, at 4.)  Plaintiffs further responded that, although
plaintiffs "presently" had "no evidence regarding any
competition between the ATC 550 series capacitors and the
accused BB capacitors," customers "[i]n other markets . . . may
have other options available to them . . . including general
purpose capacitors and capacitors from several competitors."
(*Id.*)  Additionally, plaintiffs stated that in November 2013,
"ATC did not make a sale of a 550 series capacitor to JDSU
because JDSU decided to select a different capacitor,
*potentially a general purpose capacitor* from Murata or Kyocera."
(*Id.* at 4-5 (emphasis added).)

        In support of defendant's second contention, that the
record establishes that there are noninfringing alternatives in
the market, defendant offers Dr. Randall's opinion that the '791
and '547 Patents do not justify defining the relevant market by
capacitors meeting a specific performance threshold,
specifically "insertion loss of less than 90 decibels at 40GHz."
(Def. Mem. at 6.)  Plaintiffs have not submitted any "technical
expert" rebuttal as to this opinion.  (*Id.*)

        Proceeding on its own assumption that the relevant
market is not defined by the insertion loss performance
threshold, defendant cites to record evidence that, according to
defendant, establishes the presence of alternatives in the

market.  This evidence includes plaintiffs' response to Interrogatory No. 10, (*Id.* at 6-7), and Dr. Randall's opinion that plaintiff AVX's GX capacitor is a noninfringing alternative in the market.  (*Id.* at 7.)  Defendant also cites market sales evidence and portions of Plaintiffs' expert's report suggesting that Presidio BB capacitors manufactured without vias are a noninfringing alternative, (*id.* at 7-8), and Dr. Randall's opinion that versions of the BB capacitor that plaintiffs have not accused of infringement provide "excellent insertion loss performance."  (*Id.* at 8-9 (citing, in relevant part, DSMF ¶ 58 ("Plaintiffs did not provide an expert report rebutting or responding to Dr. Randall's opinion that these alternative versions of Presidio's BB capacitor provide excellent insertion loss performance.").)

        Defendant's first contention, that plaintiffs have admitted they lost sales to third parties, is unavailing.  The interrogatory response on which defendant relies clearly differentiates the market for "high-performance, broad high-frequency capacitor[s]," which plaintiffs contend is the relevant market for the instant action, from the market for "general purpose capacitors."  (*See* Pls. Supp. Resp. to Interrog. Nos. 10 & 16 at 4-5.)  Plaintiffs have only admitted that they lost sales to a purchaser who "potentially" selected a "general purpose capacitor."  (*Id.*)  Thus, the interrogatory

response is not an admission that plaintiffs lost sales *in the relevant market* to a third party.

More importantly, plaintiffs adequately demonstrate the existence of genuine disputes for trial with respect to market definition and the presence of acceptable noninfringing alternatives under *Panduit* and *Micro Chemical*. As plaintiffs note, the deposition testimony of Lambert Devoe, chief financial officer and product manager for defendant Presidio, includes the following exchanges:

> Q:  Your understanding is that no other capacitor
> manufacturers are competitive with Presidio, ATC,
> and AVX in the market for high-performance
> broadband capacitors; correct?
> A:  Yes, that's correct.

(Lambert Devoe Deposition Transcript ("L. Devoe Tr."), Joint Deposition Transcript Annex ("JDTA"), ECF No. 119, Appx. M, at 34:8-12.)[10]

> Q:  Your understanding is that Presidio's only
> competitor with respect to Presidio's Buried
> Broadband capacitor is ATC; correct?
> A:  That's more or less correct.

(*Id.* at 29:9-12.)

> Q:  Your understanding is that, if customers in
> the market are not using Presidio's Buried
> Broadband capacitors, they're using ATC's or

---

[10]    The JDTA was filed as a stand-alone ECF entry: ECF No. 119 contains only the JDTA index, filed as the main ECF document, and the relevant transcripts, filed as exhibits/attachments to the main document.  Therefore, although each appendix to the JDTA has an individual ECF number within ECF No. 119, the court does not cite each appendix's individual number when citing to the JDTA.

AVX's broadband capacitors; correct?
A:  Yes, that's correct.

(*Id.* at 30:3-7.)

Q: So your understanding is that no other
capacitor manufacturers are – are competitive
with Presidio, ATC, and AVX in the market for
high-performance Buried Broadband capacitors;
correct?
A:  Yes, that's correct.

(*Id.* at 31:3-8.)

Mr. Devoe also testified that he does not believe that
other companies, specifically Murata, Passive Plus, and DLI,
compete in the market for high-performance broadband capacitors,
(*Id.* at 31:9-32:5), which plaintiffs contend is the relevant
market.  Plaintiffs have therefore presented evidence of the
defendant's concession that the relevant market is comprised of
two suppliers, the plaintiffs and defendant, and thus have
submitted sufficient evidence to satisfy the first factor of
*Micro Chemical*.

The record also contains deposition testimony, albeit
from AVX's senior vice president and general counsel, Mr. Evan
Slavitt, that the market served by the particular patents
involved in this case is one in which "[t]here are customers who
need very good broadband products . . . that perform at a
variety of frequencies[] and . . . act the same way in each of
those frequencies."  (Slavitt Deposition Transcript, JDTA Appx.
C, at 29:12-30:2.)  Mr. Slavitt also testified that the

capacitors in this market are "too expensive to use for regular stuff," and that "nobody who doesn't need an Ultra Broadband capacitor would put one into something that's inexpensive, [be]cause the[y']re just too expensive."  (*Id.* at 30:3-18.)

     At the summary judgment stage, the court must view all evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor.  *E.g., Mich & Mich. TGR*, 128 F. Supp. at 3d 630 (citation omitted).  Here, the record evidence would enable a reasonable finder of fact to conclude that the relevant market, which is determined based on the products' prices and functional characteristics, *Micro Chemical*, 318 F.3d at 1124, is the market for high-performance capacitors and that plaintiffs and defendant are the only suppliers in the relevant market.  This, in turn, would give rise to a presumption of "but for" causation so long as plaintiffs can establish "capability to make the diverted sales, and its profit margin," *Micro Chemical*, 318 F.3d at 1125, and defendant does not challenge plaintiffs' ability to make such a showing.

     Pointing out plaintiffs' failure to rebut Dr. Randall's "technical expert" opinion does not suffice to meet defendant's burden as the moving party, as defendant does not cite, and the court cannot locate, any authority indicating that the market definition inquiry must be resolved with reference to

"technical expert" evidence such that plaintiffs' reliance on other forms of evidence is fatal.  Additionally, a reasonable finder of fact may choose to assign little weight to Dr. Randall's opinion regarding market definition.  At this stage, the court's role is only to "determine whether there is a genuine issue for trial," not to "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, and here, there is a genuine issue of material fact for trial.

Further, the record reveals genuine disputes of material fact as to the existence of noninfringing alternatives in the market.  Plaintiffs' expert, Dr. Craig D. Hillman, has prepared a report (the "Hillman Report," DSMF Ex. M, ECF No. 120-15), in which he opines that Presidio BB capacitors without vias "possess degraded insertion loss performance or insertion loss performance similar to that of general purpose or low-cost, low-performance 'jellybean' capacitors" and that their "surface pads . . . have poor adhesion, which means that they can easily peel away or come off the dielectric body."  (Pl. Opp. at 12; Hillman Report ¶¶ 83-84.)  Dr. Hillman thus opines that Presidio's BB capacitors without vias would not be "suitable or acceptable" noninfringing alternatives.  (Hillman Report ¶ 84.)

Dr. Hillman further opines that redesigning BB capacitors' terminations so that they are not "substantially L-shaped," and thus noninfringing, would degrade the capacitors'

performance and they would therefore be unacceptable in the relevant market. (Hillman Report ¶ 52; *see also* Hillman Report ¶¶ 53-60 (discussing testing of BB capacitors with surface pads, which plaintiffs contend are part of the termination, removed so that the terminations are no longer "substantially L-shaped").)

Defendant questions Dr. Hillman's methodology and contends that his opinion is contradicted by five years of sales of BB capacitors without complaint of failure. (Def. Repl. at 4-5.) The court anticipates that defendant will make these arguments at trial, however, at this stage, it is not for the court to weigh the evidence, but only to determine whether a genuine issue exists for trial. Such an issue exists here.

Finally, defendant contends that plaintiffs offer a broadband capacitor known as the GX capacitor, and have "admitted that the GX capacitor is acceptable to the market," and that the GX capacitor does not infringe plaintiffs' patents. (Def. Repl. at 4 (citing, in relevant part, DSMF ¶¶ 42-45).) The relevant paragraphs of defendant's statement of undisputed material facts, however, do not support its conclusion. Instead, the paragraphs to which defendant cites only establish that AVX offers for sale and sells the GX capacitor, (DSMF ¶ 42), that plaintiffs have not offered any evidence that the GX is not acceptable to the market, (DSMF ¶ 43), that defendant's expert, Dr. Randall, has opined that the GX does not practice

any of the asserted claims, (DSMF ¶ 44), and that plaintiffs did
not rebut Dr. Randall's opinion.  (DSMF ¶ 45.)

Plaintiffs have admitted only that they have not
offered evidence that the GX capacitor is not acceptable to the
market.  They have not admitted that the GX capacitor is in fact
acceptable to the market.  Plaintiffs have presented a genuine
issue of fact as to whether the relevant market is comprised of
two suppliers, the plaintiffs and the defendant.  If plaintiffs
ultimately establish a two-supplier market, it will not be their
burden to establish that the GX capacitor is not acceptable.
*Micro Chemical*, 318 F.3d at 1125 ("If the patentee shows two
suppliers in the relevant market, capability to make the
diverted sales, and its profit margin, that showing erects a
presumption of 'but for' causation.").  Instead, in that
scenario, it would be for defendant to establish that there is a
noninfringing alternative in the market.  *Id.*  Further, even if
the GX capacitor were a noninfringing alternative in the market,
plaintiffs, not defendant, sell the GX capacitor, and it is
therefore not clear that defendant could rely on the GX
capacitor to establish the presence of a noninfringing
alternative in the market.  *See id.* (noting that a defendant may
rebut the presumption of but for causation by "showing that *it*
sold another available, noninfringing substitute in the market"
(emphasis added)).

Defendant's argument that Dr. Randall's opinion that BB capacitors could be redesigned to avoid using "substantially L-shaped terminations," (Def. Mem. at 10-11), and that defendant is therefore entitled to summary judgment as to lost profit damages, does not suffice to establish that summary judgment is appropriate for these same reasons. Even assuming that Dr. Randall is correct (and plaintiffs dispute his opinion), there is a genuine dispute as to whether the relevant market is a two-supplier market. If it is, defendant must rebut the presumption of "but for" causation by, for example, "showing that it *sold* another available, noninfringing substitute in the market." *Micro Chemical*, 318 F.3d at 1125 (emphasis added). And, as noted above, plaintiffs dispute Dr. Randall's opinion as to defendant's ability to redesign its BB capacitors such that they would be noninfringing alternatives acceptable to the market. In disputing Dr. Randall's opinion, plaintiffs point to issues with Dr. Randall's opinion itself, as well as to Dr. Hillman's opinion that the modifications Dr. Randall proposes would result in an inferior product. (Pl. Opp. at 11-16 (citing, *inter alia*, Rebuttal Report of Dr. Craig Hillman ("Hillman Rebuttal"), DSMF Ex. N, ECF No. 120-16, ¶ 2).) Consequently, there is a dispute as to whether a noninfringing product was "available or on the market at the time of infringement." *Grain Processing Corp. v.*

*Am. Maize-Prod. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (citation omitted).

Accordingly, genuine issues of material fact remain for trial, and the court will deny defendant's motion for summary judgment as to lost profit damages.[11]

### D. Enhanced Damages

Defendant seeks summary judgment that enhanced damages under section 284 of the Patent Act are not available to plaintiffs in the instant action. (Def. Mem. at 11-13.) "Section 284 of the Patent Act provides that, in a case of infringement, courts 'may increase the damages up to three times the amount found or assessed.'" *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1928 (2016) (quoting 35 U.S.C. § 284). The language of section 284 "contains no explicit limit or condition," and the Supreme Court has emphasized that the "word 'may' clearly connotes discretion." *Id.* at 1931 (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005)). District courts therefore "enjoy discretion in deciding whether to award enhanced damages, and in what amount[, b]ut through

---

[11]     The court notes that because the court grants defendant summary judgment with respect to the applicability of the patent marking statute to limit pre-suit damages for infringing the '547 Patent, the patent marking statute may serve to limit all damages, including lost profit damages. See 35 U.S.C. § 287(a) ("In the event of failure to so mark, *no* damages shall be recovered by the patentee in *any* action for infringement, *except* on proof that the infringer was notified." (emphasis added)). Nevertheless, the parties have not submitted argument on this issue, and the court will not decide it at this stage.

nearly two centuries of discretionary awards and review by appellate tribunals, the channel of discretion has narrowed, so that such damages are generally reserved for egregious cases of culpable behavior." *Id.* at 1932 (internal quotation marks and citations omitted).

To summarize, "[s]ection 284 allows district courts to punish the full range of culpable behavior," but does not require enhanced damages in every case where there is a "finding of egregious misconduct." *Id.* at 1933. Further, district courts should generally reserve awards of enhanced damages under 35 U.S.C. § 284 "for egregious cases typified by," but not strictly limited to, "willful misconduct." 136 S. Ct. at 1933-34. Finally, "[a]s with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Id.* at 1933.

Given that the facts of this case have yet to be fully developed at trial, granting summary judgment on an issue with respect to which the court has discretion and must take into account the full circumstances of the case is inadvisable. Furthermore, the relevant circumstances would include defendant's subjective state of mind, *see Halo Electronics*, 136 S. Ct. at 1926 ("Culpability . . . is generally measured against the actor's knowledge at the time of the challenged conduct."),

and "where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable." *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (citations omitted); *accord Equal Employment Opportunity Commission v. United Health Programs of America, Inc.*, 213 F. Supp. 3d 377, 398 (E.D.N.Y. 2016) (citations omitted).

Nevertheless, plaintiffs do not oppose Presidio's motion for summary judgment that Presidio did not willfully infringe the '547 Patent. (Pl. Opp. at 16.) Accordingly, the court will grant defendant's motion for summary judgment as to plaintiffs' claim for enhanced damages under 35 U.S.C. § 284 with respect to infringement the '547 Patent.

With respect to the '791 Patent, defendant contends that the facts of this case are "nothing like" those in cases in which courts have awarded enhanced damages under 35 U.S.C. § 284. Defendant notes that "[p]laintiffs have not identified a single fact, piece of evidence, or witness that could support a claim of egregious conduct," (Def. Mem. at 12), and that "only a few months after [p]laintiffs first notified Presidio of their allegations of infringement, Presidio removed vias from any of the accused products that incorporated that feature." (Def. Mem. at 13.) Defendant also cites the Supreme Court's *Halo Electronics* decision, in which the Supreme Court observed that

"culpability is generally measured against the actor's knowledge at the time of the challenged conduct," 136 S. Ct. at 1933 (citation omitted), and argues that "there is no evidence that Presidio compared any of the asserted claims of the '791 [P]atent to the accused products and formed an opinion that Presidio likely was infringing."  (Def. Mem. at 13.)

Plaintiffs, however, assert that undisputed evidence in the record demonstrates that defendant has had a copy of the '791 Patent since 2002.  (Pl. Opp. at 18 (citing Defendant's Response to Interrogatory No. 8, Declaration of Peter Snell in Opposition to Defendant's Motion ("Snell Opp. Decl."), ECF No. 122-2, Ex. 9, ECF No. 122-11, at 27 ("Presidio was aware of the '791 patent no later than May 6, 2002.") and Alan Devoe Deposition Transcript ("A. Devoe Tr."), JDTA Appx. A, at 105:19-25 (testifying, as Rule 30(b)(6) witness, that defendant first became aware of the '791 Patent in 2002).)  Plaintiffs also note evidence establishing that, in 2008, Mr. Lambert Devoe, who plaintiffs characterize as defendant's co-owner and the manager of the BB capacitor product line, received an email marked "high importance" with the subject line "Personal: (2) ATC Patents" that attached the cover page of the '791 Patent.  (Pl. Opp. at 19; L. Devoe Tr., JDTA Appx M at 113:22-115:21.)

Viewing this evidence in the light most favorable to plaintiffs and drawing all inferences in their favor, the court

cannot conclude at the summary judgment stage that a finding that defendant did not act with sufficient culpability to warrant enhanced damages under 35 U.S.C. § 284 would be an appropriate exercise of the court's discretion.  Accordingly, the court denies defendant's motion for summary judgment as to plaintiffs' claim for enhanced damages under 35 U.S.C. § 284 with respect to infringement of claim 2 of the '791 Patent.

### E.  Definiteness

Defendant seeks summary judgment that the '547 Patent is invalid for indefiniteness because there is no reasonably certain standard for determining what constitutes a "substantially L-shaped termination," or what constitutes a "negligible" amount of termination on the top surface of a capacitor.  (Def. Mem. at 14-23.)

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  Further, patents enjoy a "presumption of validity, a presumption not to be overthrown except by clear and cogent evidence."  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 101 (2011) (quoting *Radio Corp. of America v. Radio Engineering Laboratories*, 293 U.S. 1, 2

(1934)); *see also* 35 U.S.C. § 282(a) (providing that a patent
and each of its claims "shall be presumed valid," and "[t]he
burden of establishing the invalidity of a patent or any claim
thereof shall rest on the party asserting such invalidity.").
Thus, invalidity, including by reason of indefiniteness, must be
proven by clear and convincing evidence. *Microsoft*, 564 U.S. at
95.

Although indefiniteness is ultimately a question of
law, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341
(Fed. Cir. 2015) (quoting *Wellman, Inc. v. Eastman Chem. Co.*,
642 F.3d 1355, 1365-66 (Fed. Cir. 2011)), "[t]he sufficiency of
a patent's written description is a question of fact." *Scanner
Techs. Corp. v. Icos Vision Sys. Corp., N.V.*, 253 F. Supp. 2d
624, 633 (S.D.N.Y. 2003) (citing *Amgen Inc. v. Hoechst Marion
Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) and *Enzo
Biochem, Inc. v. Gen-Probe Inc.*, 296 F.3d 1316, 1324 (Fed. Cir.
2002)), *adhered to on reconsideration*, No. 00-CV-4992(DC), 2003
WL 1961565 (S.D.N.Y. Apr. 28, 2003); *see also Teva
Pharmaceuticals*, 789 F.3d at 1342 ("Understandings that lie
outside the patent documents about the meaning of terms to one
of skill in the art or the science or state of the knowledge of
one of skill in the art are factual issues.").

In arguing that the '547 Patent is indefinite,
defendant devotes significant argument, and defendant's expert

expounds expansively, on the existence of various capacitor termination shapes and the difficulty of determining whether a termination is or is not L-shaped, as well as the difficulty of distinguishing between L-shaped terminations and those with other shapes, such as U-shaped terminations. (*See* Def. Mem. at 15-19; Randall Report, DSMF Ex. F, ECF No. 120-8, ¶¶ 547-83.) Defendant and its expert raise similar arguments and opinions regarding the purported lack of a reasonably certain standard for determining what constitutes a "negligible" amount of termination on the top surface of a capacitor. (*See* Def. Mem. at 19-23; Randall Report ¶¶ 585-602.) Importantly, all of defendant's arguments go to the sufficiency of the relevant descriptions in the '547 Patent.

However, plaintiffs have submitted the expert report of Dr. Stanley R. Shanfield, which opines that a person of skill in the art would understand the term "substantially L-shaped terminations" and be able to determine whether specific terminations are substantially L-shaped. (Shanfield Report, DSMF Ex. G, ECF No. 120-9, ¶¶ 199-201.) This alone creates a disputed issue of material fact as to the sufficiency of the written description because a reasonable finder of fact could conclude, taking into account both Dr. Shanfield's opinion and Dr. Randall's opinion, that defendant cannot prove indefiniteness by clear and convincing evidence. *See Scanner*

*Techs.*, 253 F. Supp. 2d at 633 ("[I]f there is conflicting evidence as to what one of ordinary skill in the art would have known, resolution of that conflict is not appropriate on a motion for summary judgment." (quoting *Levi Strauss & Co. v. Golden Trade, S.r.L.*, No. 90-CV-6291 (RPP), 1995 WL 710822, at *11 (S.D.N.Y. Dec. 1, 1995))).

Furthermore, the '547 Patent was challenged as part of the *inter partes* review proceedings that defendant initiated, and the PTAB concluded that defendant had failed to show, by a preponderance of the evidence, that the challenged claims were unpatentable. ('547 Decision, ECF No. 85-7, at 2.) Although the *inter partes* review challenge focused on the challenged claims' alleged obviousness, (*id.* at 7-20), the PTAB's opinion necessarily involved construction and application of the terms "substantially L-shaped" and "negligibly over the top surface." (*See id.* at 3-8 (construing '547 Patent's terms.) This court also previously construed these terms in its claim construction order. (Cl. Constr. Order at 16-22.) Defendant does not explain how the court and PTAB were both able to construe these terms, yet any reasonable finder of fact must conclude that they are indefinite on a clear and convincing evidence standard.[12]

---

[12] The court refers to the PTAB proceedings only to note that the PTAB was able to understand the relevant claims in the '547 Patent. Nothing in this order should be taken as a conclusion that 35 U.S.C § 315(e)(2) bars defendant, as petitioner in the *inter partes* review proceeding, from arguing indefiniteness. Section 315(e)(2) can only apply to bar invalidity arguments

The record before the court demonstrates the existence of a genuine dispute of material fact as to the sufficiency of descriptions in the '547 Patent. Accordingly, the court denies defendant's motion for summary judgment as to the invalidity of the '547 Patent based on indefiniteness.

**F. Noninfringement**

Defendant seeks summary judgment of noninfringement as to both the '547 Patent and the '791 Patent.

Subject to certain exceptions not applicable here, patent infringement consists of "mak[ing], us[ing], offer[ing] to sell, or sell[ing] any patented invention" without authority. 35 U.S.C. § 271(a). "A two-step process is used in the analysis of patent infringement: first, the scope of the claims are determined as a matter of law, and second, the properly construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial equivalent, in the accused device." *Mich & Mich. TGR*, 128 F. Supp. 3d at 631 (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002)).

---

on "ground[s] that the petitioner raised or reasonably could have raised during that *inter partes* review." The grounds for invalidity that can be raised in *inter partes* review are specified in 35 U.S.C. § 311, and from that section and those to which it refers, it appears that definiteness is outside the scope of *inter partes* review.

### 1. Special Considerations for Summary Judgment in Patent Infringement Cases

"'Infringement is itself a fact issue,' [and] therefore courts have repeatedly emphasized that patent claims 'are ones in which issues of fact often dominate the scene and summary judgment is allowed only with great caution.'" *Mich & Mich. TGR*, 128 F. Supp. 3d at 630 (quoting *SRI Int. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) and *Acrison, Inc. v. Schenck Corp.*, 973 F.Supp. 124, 126 (E.D.N.Y. 1997)).

Nevertheless, summary judgment is appropriate if "no genuine issue of material fact exists and no expert testimony is required to explain the nature of the patented invention or the accused product or to assist in their comparison," *id.* at 629 (citing *Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1557-58 (Fed. Cir. 1996)), and if "no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Id.* at 631 (quoting *Spiel Associates, Inc. v. Gateway Bookbinding Sys., Ltd.*, No. 03-CV-4696, 2010 WL 546746, at *6 (E.D.N.Y. Feb. 16, 2010)).

Here, because plaintiffs do not argue infringement under the doctrine of equivalents (DSMF ¶ 143; PSMF ¶ 143), summary judgment will be appropriate only if "no reasonable jury

could find that every limitation recited" in the relevant claims is literally present in the accused products.  *Id.* at 631 (citation omitted).

### 2.  *The '547 Patent*

Defendant seeks summary judgment that the accused devices do not infringe the '547 Patent as they do not incorporate "substantially L-shaped terminations" or "terminations . . . extending negligibly" on or over "a top surface" of the device body.[13]  (Def. Mem. at 23-31.)  All claims of the '547 Patent require the presence of both of these limitations.  (DSMF ¶ 130, 159; PSMF ¶ 130, 159.)

The parties' briefing makes clear that the proper construction of "termination" is critically important to, if not dispositive of, this portion of defendant's motion for summary judgment.  For instance, in arguing that the accused products do not have "substantially L-shaped terminations," defendant contends that plaintiffs' infringement theory is contingent on external electrodes, or surface pads, which are located on the bottom of the accused products, forming part of the device termination and thereby constituting the lower portion of the

---

[13]    Claims 1-11 of the '547 Patent require terminations extending "negligibly over a top surface of said device," while claims 12-18 require terminations extending "negligibly on a top surface of said device."  ('547 Patent, ECF No. 1-3, at 6:12-18, 7:4-8.)  Although plaintiffs note this differing language, (PSMF ¶ 159), they do not contend that "over" and "on" have materially different meanings.

"L." (Def. Mem. at 25-27.) Defendant further contends that the record establishes that surface pads cannot be considered part of the termination and directs the court to the deposition testimony of two of plaintiffs' engineers, as well as to Dr. Randall's expert report in support of this contention. (Def. Mem. at 26-27.) Defendant also argues that the accused devices have U-shaped terminations, not L-shaped ones. (Def. Mem. at 23-25.) In advancing this argument, defendant implicitly contends that the "dipping process used for all of the accused devices," which is not used to apply surface pads, constitutes the sole means for applying terminations, at least with respect to the accused products. (*See Id.*)

Plaintiffs, for their part, do not challenge defendant's assertion that their infringement theory is contingent on surface pads constituting a portion of the termination structure. Instead, plaintiffs contend that "[t]he surface pads or external electrodes of the accused . . . capacitors are terminations," (PSMF ¶ 144), and point to the report of Dr. Hillman in which he opines that the combined structure including dipped end terminations and surface pads forms the capacitor's termination structure. (Pl. Opp. at 30 (citing, in relevant part, Hillman Report DSMF Ex. M, ECF No. 120-15, ¶¶ 40, 41, 51, 64).) Determining which of these

arguments should prevail requires an operable definition of "terminations."

The proper construction of "terminations" is also critically important to determining whether the accused devices' terminations extend "negligibly over a top surface." As the court stated in its claim construction order, "[b]y definition, the top configuration must be smaller than the bottom configuration in order for the top termination portion to extend 'negligibly,' and for the terminations as a whole to appear 'substantially L-shaped.'" (Cl. Constr. Order at 22.) As noted above, surface pads are situated on the bottom of the accused products' device body, and thus, a comparison of the top and bottom termination configurations of the accused devices necessarily requires clarity as to whether surface pads are part of the termination structure.

Although the court has not previously construed "terminations," the parties' briefing makes clear that the court must do so in order to adjudicate defendant's motion for summary judgment. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." (citation omitted)); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (stating that

the court must construe those terms that are in controversy to the extent necessary to resolve the controversy); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("We hold that the construction of a patent, including terms of art within its claim, is exclusively within the province of the court."). Importantly, the court must construe "terminations" "objectively and without reference to the accused device[s]." *Vivid Techs.*, 200 F.3d at 803. After the court has "properly construed," that is, "determined as a matter of law," the meaning of "terminations" as recited in the '547 Patent, the court can then determine whether the limitations at issue are present in the accused devices. *Teleflex*, 299 F.3d at 1323.

As the court has noted, at the initial claim construction stage, the parties did not include "terminations" on their Joint Disputed Claims Chart, (*see* JDTC, ECF No. 48-1), and agreed that terms not appearing on that chart should be "given their plain and ordinary meaning." (JDTC Notice, ECF No. 48 at 1.) The record, however, contains very little information as to the plain and ordinary meaning of "terminations," in capacitors. Indeed, neither party has suggested a "plain and ordinary meaning," nor has either party directed the court to any information that would aid in the objective construction of "terminations," even as the parties spar over whether the

accused products' surface pads fall within the (undefined) plain
and ordinary meaning of terminations.

Additionally, the court is aware of only two items of
information in the record, both from the *Markman* hearing, that
shed any light on the objective "plain and ordinary meaning" of
"terminations": Dr. Shanfield's statement that terminations are
"the things at the ends of the capacitor," (*Markman* Tr., ECF No.
80, at 23:1-10), and Dr. Randall's testimony that electrodes are
connected to the termination end. (*Id.* at 98:17-20.) The
parties have therefore put the proverbial cart, *i.e.*,
determining whether the accused products practice a limitation,
before the horse, *i.e.*, properly construing that limitation.

On this record, the court is not inclined to supply
and apply an objective "plain and ordinary meaning" for
"terminations" without first giving the parties another
opportunity to elucidate their respective positions regarding
that meaning. Although the court has "wide latitude" with
respect to claim construction such that it "may approach the
task in any way that it deems best," *Ballard Med. Prods. v.
Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir.
2001), the Federal Circuit has not looked favorably on at least
one instance in which a district court has decided a claim
construction issue without affording litigants the opportunity
to be heard on claim construction, even where the parties had

previously stipulated regarding the proper construction of the claim at issue and later disputed the term. *See TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*, 629 F. App'x 916, 939 (Fed. Cir. 2015) (vacating award of summary judgment where district court *sua sponte* decided case determinative claim construction issue without input from either party and collecting cases).[14]

Additionally, Federal Circuit precedent indicates that summary judgment is inappropriate absent a "focused and systematic claim-construction analysis" by the district court. *See Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 721, 725 (Fed. Cir. 2014) (vacating award of summary judgment and remanding to district court for further claim construction where there was "insufficient exploration in the record . . . of too many questions of apparent relevance to identifying a proper construction of the limitation."). The record here precludes a "focused and systematic" analysis

---

[14]     The circumstances in which the district court found itself in *TNS Media Research* are somewhat similar to the circumstances here.  In that action during claim construction, the parties agreed to construe a limitation term in a certain way.  629 F. App'x at 938.  At the summary judgment stage, however, the parties "contested whether they actually agreed how [the limitation term] should be construed," specifically by disputing whether a term in their stipulated construction should itself be defined.  *Id.*  "In order to resolve [the] summary judgment motion, the district court decided to further construe the parties' stipulated construction. It then applied this second construction to the disputed . . . [p]roducts, without further input from the parties."  *Id.*  The Federal Circuit found this procedure improper. *Id.*  Although the Federal Circuit's decision in *TNS Media Research* was not selected for publication in the Federal Reporter, it nevertheless gives the court significant pause as to the propriety of construing "terminations" without first inviting the parties to weigh in more directly on the issue.

regarding the proper construction of "terminations," and, as suggested above, raises the distinct possibility that any effort at such an analysis would be improper. *See TNS Media Research*, 629 F. App'x at 939 (vacating grant of summary judgment "[b]ecause the district court improperly construed the parties' stipulation and [decided] summary judgment based on that construction, without affording [either party] notice or opportunity to present argument about the appropriate construction").

In summary, the instant action has given rise to an occurrence that the Federal Circuit describes as "frequent" in patent litigation: the parties have stipulated to a construction of a term, only to for it to become clear that "a further construction is necessary." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014). In light of the importance of the word "terminations" and the paucity of information in the record that could guide the court in determining its "plain and ordinary meaning," the court will avail itself of its "wide latitude" with respect to claim construction and decline to decide the issue in connection with the instant motion.

The court will therefore deny defendant's motion for summary judgment of noninfringement with respect to the '547 Patent. The proper construction of "terminations" as recited in

the '547 Patent's limitations is an issue of law, *Markman*, 517
U.S. at 372, and absent such construction, the court cannot
conclude that defendant is entitled to judgment as a matter of
law.  As set forth above, the court cannot properly construe
"terminations" on the record before it, and denies defendant's
motion on noninfringement of the '547 Patent without prejudice
to defendant's ability to renew its motion either following, or
concurrently with, the aforementioned supplemental claim
construction proceedings, as the parties may agree and subject
to the court's approval.[15]  The parties are directed to confer
and, within seven (7) days of entry of this order, submit a
joint letter to the court setting forth a joint plan for claim
construction proceedings with respect to the word "terminations"

---

[15]    The court notes that defendant also moves for summary judgment of
noninfringement of the '547 Patent, based on its contention that the presence
of termination material on the lateral sides of the accused products' device
bodies precludes a finding that the accused products' terminations are
"substantially L-shaped."  (Def. Mem. at 24-25.)  The court previously
rejected defendant's effort to add to the "substantially L-shaped" limitation
"further clarifying language that 'terminations that extend around the
lateral sides of the device body[] are excluded."  (*See* Cl. Constr. Order at
17-20.)  In rejecting defendant's proposed language, the claim construction
order states that "[t]erminations having a U-shape are already excluded by
the ordinary meaning of 'substantially L-shaped,' because a structure with
'terminations that extend around the lateral sides' of a device body would
not be L-shaped."  (*Id.* at 20.)  In other words, terminations extending onto
the lateral sides of a device body are excluded by the ordinary meaning of
"substantially L-shaped" to the extent the presence of termination material
on the lateral sides of the device renders the termination other than
"substantially L-shaped," but only to that extent.  The court therefore
declines to award summary judgment to defendant based on the mere presence of
termination material on the lateral sides of the accused devices.  The term
"terminations" must be construed before the court can determine whether there
are material disputes in the evidence as to the shape of the accused devices'
terminations.  The court reiterates that this denial of summary judgment is
without prejudice to defendant's ability to renew its motion as to
noninfringement of the '547 Patent as set forth in this order.

as recited in the '547 Patent, including a briefing schedule and a statement as to whether a hearing is necessary.

### 3. The '791 Patent

Defendant's motion for summary judgment regarding noninfringement of the '791 Patent is focused on the sole claim remaining at issue, claim 2. Defendant characterizes that claim as requiring first and second dielectric layers, and requiring that those layers be coextensive in length as well as in width. (DSMF ¶ 167.) Plaintiffs dispute defendant's characterization and assert that the claim requires that "the first dielectric layer of the capacitor . . . have a length dimension that is co-extensive with the length dimension of a second dielectric layer of that capacitor and [that] the first dielectric layer . . . also have a width dimension that is co-extensive with a width dimension of that second dielectric layer."  (PSMF ¶ 167.) These statements appear to employ different words to convey the same concept.

Defendant seeks summary judgment of noninfringement of the '791 Patent based on its assertion that plaintiffs' evidence is insufficient as a matter of law to demonstrate that the coextensive length and width limitations are present in the accused products.  (Def. Mem. at 31.)  In support of its assertion, defendant cites several exhibits in plaintiffs' expert that depict both side cross-section views and end cross-

section views of BB capacitors, but with respect to each
exhibit, the side view and the end view depict different
capacitor units. (*Id.* at 31-32.)  With respect to the
individual capacitor depicted in the side view, there is no
evidence regarding the width of its dielectric layers, and with
respect to the individual capacitor depicted in the end view,
there is no evidence regarding the length of its dielectric
layers. (*Id.*)

Defendant also includes a side cross section of a
Presidio BB capacitor in size 0302, which was initially
presented by plaintiffs' expert and then annotated by Dr.
Randall. (*Id.* at 33-34.)  The relevant image is as follows:



(*Id.* at 34.)

In this image, the first dielectric layer is depicted in light blue and labeled with the number "1," and the second dielectric layer is shaded in depicted and labeled with the number "5." (*Id.*) As can be seen above, the relevant layers do not appear to have the same width. Defendant submits that the same is true for each of the four exhibits to the Hillman Report, and that the Randall Report includes further exhibits establishing that either the lengths or the widths of the first and second dielectric layers are not equal. (Def. Mem. at 34-35.)

In opposition to defendant's motion, plaintiffs offer sufficient evidence to create a genuine issue of fact for trial and enable a reasonable finder of fact to determine that Presidio's BB capacitors do practice the '791 Patent. As plaintiffs note, in discovery, plaintiffs presented defendant with an image of a Presidio BB capacitor and defendant "[a]dmitted" that the length and width dimensions of its first and second dielectric layers were coextensive. (Pl. Opp. at 34; Excerpts of Response to Request for Admission No. 50, Snell Opp. Decl. Ex. 18, ECF No. 122-20 at 20-21.)

Plaintiffs also offer Dr. Hillman's report and rebuttal report, which provide sufficient evidence for a reasonable finder of fact to conclude that the accused products practice the '791 Patent for two reasons. First, Dr. Hillman's

report includes analysis that, viewed in the light most favorable to plaintiffs, would establish that the relevant dielectric layers in the accused products are coextensive. As an example, the following image of a side cross-section of a Presidio BB capacitor would support a finding of coextensiveness in the length dimension:



Coextensive dielectric layers (green (5), blue (1)) in Presidio's BB capacitors

(Pl. Opp. at 35 (citing Hillman Report, DSMF Ex. M, ECF No. 120-15, Ex. 32 at 6).)

The portion of the Hillman Report to which plaintiffs cite also includes a similarly annotated end cross-section of a Presidio BB capacitor, which would support a finding of coextensiveness in the width dimension. Specifically, it includes the following image of the width dimension, in which the first and second dielectric layers in a Presidio BB capacitor are shaded in blue (1) and green (5):



(Hillman Report Ex. 32 at 6.)

Second, Dr. Hillman's rebuttal report includes opinions that, viewed in the light most favorable to plaintiffs, raises a disputed material fact as to Dr. Randall's coextensiveness analysis, thus preventing Dr. Randall's from serving as the basis for granting summary judgment based on coextensiveness of dielectric layers.  Of particular relevance to the instant motion, Dr. Hillman disputes the manner in which Dr. Randall positioned line markers in analyzing the dielectric layers' length and width.  (Hillman Rebuttal, DSMF Ex. N, ECF No. 120-16, ¶ 3.)

Dr. Hillman also opines that Dr. Randall's methodology is flawed because Dr. Randall improperly relies on "localized imperfections in the images that are not characteristic of the capacitors" in determining coextensiveness, and "point[s] to regions too close to the corners or vertices of the capacitor to be indicative of the actual length and width of the dielectric

layers." (*Id.*) Further, in support of each of his contentions, Dr. Hillman identifies specific diagrams or images in Dr. Randall's analysis. (*Id.*) Dr. Hillman also states that he "further polished and reimaged" at least certain capacitors identified in his initial report to "confirm that Dr. Randall only identifies localized imperfections in [the] original images." (Hillman Rebuttal ¶ 3 and Ex. 2.)

The court also notes that Dr. Randall, who is defendant's expert, gave deposition testimony that a reasonable finder of fact could conclude undermines Dr. Randall's opinion as to coextensiveness in light of Dr. Hillman's rebuttal report. Dr. Randall testified as follows:

> Q: Do you agree that when multi-layer capacitors are cut longitud[inal]ly and transversely during the manufacturing process, all of their dielectric layers will be coextensive in length and width?
> A: If done properly, yes.

(Randall June 13, 2017 Deposition Transcript, JDTA Appx. J at 68:2-7.)

Additionally, for purposes of defeating a motion for summary judgment, plaintiffs more than sufficiently address defendant's efforts to cast doubt on Dr. Hillman's methodology. Plaintiffs state that Dr. Hillman "analyzed the length and width dimensions of the dielectric layers by polishing a first capacitor in the length dimension and polishing a different

capacitor of the same type (*i.e.*, same lot) in the width dimension." [16]  (Pl. Opp. at 34.)  In other words, to analyze the length, Dr. Hillman polished off an end portion of the width dimension, thereby destroying a portion of the width dimension. Similarly, to analyze the width dimension, Dr. Hillman polished off an end portion of the length dimension, thereby destroying a portion of the length dimension.  Plaintiffs also point to testimony from defendant's expert that confirms the viability of this explanation.  Specifically, when deposed, Dr. Randall testified as follows:

> Q:  After Chip 1 was grinded and polished in the lengthwise direction to analyze coextensiveness in the length direction, it would not have been possible to then grind and polish that same Chip 1 capacitor in the widthwise direction to analyze coextensiveness in the width direction, correct?
> A:  For both sides of the width, that is correct. To determine whether it's not coextensive, at least with respect to one side, you could.  But only for that.  So you couldn't understand that the entire width is coextensive.  It's been destroyed.
> Q:  You did not analyze the length and width of the bottom two dielectric layers of the same capacitor anywhere in your reports in this case, correct?
> A:  No.  I didn't believe I needed to.

(Randall July 18, 2017 Deposition Transcript, JDTA Appx. L at 354:3-24.)

---

[16]    Plaintiffs do not actually cite, and the court cannot locate, any statement in Dr. Hillman's reports or the transcript of his deposition establishing that this is actually how Dr. Hillman conducted his analysis, but defendant does not dispute this contention.

Plaintiffs have responded to defendant's argument that their plaintiffs' evidence is flawed with an explanation of the process by which capacitor units were compared, and which finds support in the deposition testimony of defendant's expert witness. Moreover, plaintiffs' explanation addresses defendant's contention that plaintiffs' failure to submit evidence regarding the coextensiveness of the length and width dimensions of the first and second dielectric layers in any single, individual capacitor unit is fatal to plaintiffs' infringement case with respect to the '791 Patent.

In summary, the court concludes that whether the accused products in fact contain first and second dielectric layers that are coextensive in the length and width dimensions remains genuinely disputed. Plaintiffs' expert opinion provides evidence upon which a reasonable finder of fact could find that the accused products do contain such coextensive layers, and thus practice the limitation of claim 2 of the '791 Patent that is at issue in the instant motion. The record also contains a viable explanation of plaintiffs' failure to submit both side and end cross-section views of any single, individual capacitor unit, and a viable rebuttal of Dr. Randall's expert opinion. Accordingly, defendant's motion for summary judgment of noninfringement with respect to claim 2 of the '791 Patent is denied.

## II.  Plaintiffs' Motion for Summary Judgment as to Equitable Defenses

Plaintiffs seek summary judgment as to defendant's asserted equitable defenses of laches, equitable estoppel, and waiver.  Equitable defenses are "highly fact intensive and not typically amenable to summary judgment," *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 420 (S.D.N.Y. 2012) (citing *U.S. Bank N.A. v. Ables & Hall Builders*, 582 F.Supp.2d 605, 611 (S.D.N.Y. 2008)), but summary judgment as to an affirmative defense is appropriate where the moving party establishes that there is no genuine disputed issue of material fact as to any element of the defense and the moving party is entitled to a judgment as a matter of law.  *See, e.g.*, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992) (discussing summary judgment standard as applied to equitable defenses), *abrogated by SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954 (2017); *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998) (discussing summary judgment standard where defendant in patent infringement action sought summary judgment in its favor on a laches defense); *see also Dunkin' Donuts Franchised Restaurants LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662(KAM)(MDG), 2009 WL 2997382, at *4-5 (E.D.N.Y. Sept. 15, 2009) (discussing summary

judgment standard where plaintiffs sought summary judgment as to, *inter alia*, defendant's affirmative defenses).

"However, when there are disputed underlying factual elements, summary judgment is inappropriate unless the movant would prevail even on the non-movant's view of the facts." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010) (citing *Anderson*, 477 U.S. at 247-48) (reviewing summary judgment that patentee was equitably estopped from pursuing infringement claim).

## A. Laches

Plaintiffs seek summary judgment that defendant may not assert laches as a matter of law. (Pl. Mem. at 1.) "Laches is a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene*, 137 S. Ct. at 960 (internal quotation marks and citation omitted). As an equitable defense, laches is "committed to the sound discretion of the district court." *A.C. Aukerman*, 960 F.2d at 1032 (citations omitted). To establish a laches defense, a defendant "must show that plaintiffs had knowledge of defendant's [challenged conduct], that plaintiff[s] inexcusably delayed in taking action with respect thereto, and that defendant[] will be prejudiced by permitting plaintiffs inequitably to assert [their] rights at this time." *Citibank, N.A. v. Citytrust*, 644 F. Supp. 1011, 1012 (E.D.N.Y. 1986)

(quoting *Cuban Cigar Brands, N.V. v. Upmann International, Inc.*, 457 F. Supp. 1090, 1096 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979)).

Plaintiffs contend that the Supreme Court's decision in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954 (2017), is controlling and bars defendant's laches defense. (Pl. Mem. at 1, 3-4.) Defendant, for its part, contends that plaintiffs' reading of *SCA Hygiene* is overbroad as that case stands only for the proposition that "[l]aches cannot be invoked as a defense against *a claim for damages* brought within [35 U.S.C.] § 286's 6-year limitations period." (Def. Opp. at 2 (quoting *SCA Hygiene*, 137 S. Ct. at 967 (syllabus)) (emphasis added by defendant).) Defendant therefore asserts that laches remains available as a defense to claims for equitable relief, which defendant contends include claims seeking an award of ongoing royalties or for a permanent injunction. (*Id.* at 3 (quoting *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, 807 F.3d 1311, 1332 (Fed. Cir. 2015) and *eBay Inc. v. MercExchange, LLC,* 126 S. Ct. 1837, 1838 (2006) (syllabus)).)

Neither party argues that any material facts are in dispute as to the availability of laches as a defense – instead, the question before the court is whether the laches defense is available as a matter of law.

In *SCA Hygiene*, the Supreme Court held that its

reasoning in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct.

1962, 1967 (2014), in which the court held that "laches cannot

preclude a claim for damages incurred within the Copyright Act's

3 year limitations period . . . applies to a similar provision

of the Patent Act, 35 U.S.C. § 286," 137 S. at Ct. 959, and

consequently, "[l]aches cannot be interposed as a defense

against damages where the infringement occurred within the

period prescribed by § 286." *Id.* at 967. The Supreme Court's

decision in *SCA Hygiene* therefore clearly precludes defendant

from raising a laches defense as to damages within the

limitation period set forth in 35 U.S.C. § 286.

Although *SCA Hygiene* did not expressly address the

continued vitality of laches as a defense to equitable relief,

the *Petrella* court did, although briefly, and wrote that "in

extraordinary circumstances, laches may bar at the very

threshold the particular relief requested by the plaintiff. And

a plaintiff's delay can always be brought to bear at the

remedial stage, in determining appropriate injunctive relief,

and in assessing the 'profits of the infringer . . .

attributable to the infringement.'" *Petrella*, 134 S. Ct. at

1967 (quoting 17 U.S.C. § 504(b)). In keeping with these

decisions, the court finds that, should this case reach the

remedial stage, defendant may argue delay by plaintiffs in opposing injunctive relief.

The availability of laches as a defense to a claim for royalties presents a more difficult question. The *Petrella* court noted that the Copyright Act provides for recovery of profits as a remedy for copyright infringement and that "[l]ike other restitution remedies, 'recovery of profits is not easily characterized as legal or equitable,' for it is an 'amalgamation of rights and remedies drawn from both systems.'" *Petrella* 134 S. Ct. at 1967 n.1 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 4, comment (b)). The *Petrella* court further wrote that "[g]iven the 'protean character' of the profits-recovery remedy, we regard as appropriate its treatment as 'equitable' in this case," *id.* (quoting Restatement (Third) of Restitution and Unjust Enrichment § 4, comment (c)), but provided no further guidance as to how other, potentially similar, remedies such as an award of ongoing royalties should be treated in other cases. Here, however, plaintiffs stated on the record at oral argument that they did not believe that awarding plaintiffs summary judgment as to laches would preclude defendant from raising plaintiffs' "alleged undue delay in filing suit" with respect to a potential ongoing royalty award, should these proceedings reach that stage. (*See* Arg. Tr., ECF No. 113 at 5:6-22.)

Accordingly, the court will grant plaintiffs' motion for summary judgment as to the laches defense to liability and damages, except for ongoing royalties based on plaintiffs' concession, within the limitations period in 35 U.S.C. § 286. Should this action reach the remedial stage, however, defendant may assert laches, or "undue delay," as against an award of an ongoing royalty or injunctive relief.

## B. Equitable Estoppel

Plaintiffs also seek summary judgment as to defendant's equitable estoppel defense on the grounds that defendant cannot prove the elements of the defense. (Pl. Mem. at 1.) At oral argument, on the instant motion, defendant stated that its "equitable estoppel defense is not intended to be applicable to the '547 Patent." (Arg. Tr. at 13:5-7.) The court therefore only addresses equitable estoppel as to the '791 Patent.

As with laches, "the applicability of equitable estoppel is 'committed to the sound discretion of the trial judge.'" *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013) (quoting *A.C. Aukerman*, 960 F.2d at 1028); *see also Aspex Eyewear*, 605 F.3d at 1310 ("A summary judgment of equitable estoppel is reviewed for an abuse of discretion." (citation omitted)). An accused infringer must establish three elements to establish an equitable estoppel defense:

(1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Radio Sys. Corp.*, 709 F. 3d at 1130 (citing *A.C. Aukerman*, 960 F.2d at 1028).

A party asserting equitable estoppel must establish each of the three elements by a preponderance of the evidence, and silence alone will not give rise to equitable estoppel. *Ferring B.V. v. Allergan, Inc.*, 253 F. Supp. 3d 708, 716 (S.D.N.Y. 2015) (quotations and citations omitted). Therefore, summary judgment in plaintiffs' favor will be appropriate if, viewing the record in the light most favorable to defendant, no genuinely disputed issues of material fact remain and the court could find that defendant cannot establish any of the three elements by a preponderance of the evidence.

As noted above, although the applicability of equitable defenses, including equitable estoppel, lies within the sound discretion of the court, the defenses are nevertheless "highly fact intensive and not typically amenable to summary judgment." *Gucci America*, 843 F. Supp. 2d at 420; *see also Intelligent Digital Sys., LLC. v. Beazley Ins. Co.*, 906 F. Supp. 2d 80, 95 (E.D.N.Y. 2012) ("[Equitable e]stoppel is usually a

question of fact inappropriate for summary judgment." (citations omitted)); *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1365 (Fed. Cir. 2011) ("The issue of equitable estoppel is an equitable determination, based on underlying findings of fact.")).

Defendant contends that plaintiffs misled it "through (1) statements made by [p]laintiffs during a patent infringement lawsuit involving the products accused of infringement in this case, *i.e.*, Presidio's BB capacitors, and (2) [p]laintiffs' five-year long silence and inaction thereafter, despite having extensively analyzed Presidio's BB capacitors and formed a belief that those products infringe."  (Def. Opp. at 4.)

The specific statements to which defendant refers arise from the testimony of Ms. Kathleen Kelly, then a Vice President at ATC, in *Presidio Components Inc. v. American Technical Ceramics Corp.*, No. 08-CV-335(IEG) (S.D. Cal.) ("*Presidio I*").  Ms. Kelly testified in December 2009 and stated that ATC follows a "live and let live" policy with respect to its intellectual property, and further stated that "one of Presidio's products actually infringes our Monsorno BMC patents and we've never filed suit."[17]  (Def. Opp. at 6; Defendant's Response to Plaintiffs' Statement of Material Facts ("RSMF"),

---

[17]    A "BMC" is a "buried (electrically isolated) layer capacitor," which is "generally regarded to be equivalent to two capacitors arranged in series with each other."  '791 Patent, ECF No. 1-3, at 2:34-46.

ECF No. 117-1, ¶ 27 (quoting and citing Kelly *Presidio I* Testimony ("Kelly Tr."), RSMF Ex. 14, ECF No. 117-8, at 26:14-22).) Although not highlighted by defendant, Ms. Kelly also testified that this policy was "set by [ATC's] founder." (Kelly Tr. at 26:14-22.)

To contextualize the significance of this statement, defendant notes that the '791 Patent lists Richard Monsorno as the inventor. (Def. Opp. at 5; see also '791 Patent, ECF No. 1-3, at 1.) Defendant further notes that plaintiffs have conceded that they purchased and acquired defendant's BB capacitors no later than November 2001. (Def. Opp. at 4-5; RSMF ¶ 19 (citing Plaintiffs' Response to Interrogatory No. 4, RSMF Ex. 8, ECF No. 117-2).) Furthermore, defendant contends that plaintiffs repeatedly analyzed the defendant's BB capacitors, including in each year between 2001 and 2005. (Def. Opp. at 5; RSMF ¶ 20 (citing RSMF Ex. 9, ECF No. 117-3 (documents appearing to indicate that testing took place, including notes and test results)).)[18] Defendant also directs the courts to evidence indicating that, as early as 2004, plaintiffs formed a belief that defendant's capacitor infringed certain patents held by plaintiffs, particularly a patent invented by Mr. Richard

---

[18] Defendant characterizes these documents as exhibits to the deposition of John Mruz, one of plaintiffs' engineers, but the portions of the deposition authenticating these exhibits do not appear to have been submitted.

Monsorno. (Def. Opp. at 5; RSMF ¶ 22 (citing RSMF Ex. 11, ECF No. 117-5 (consisting of internal ATC communications and including a statement from Mr. John Mruz, then an ATC employee, that Presidio "use[s] our patented BMC configuration" to achieve certain performance in certain capacitors)).)

Finally, defendant notes that ATC asserted "several counterclaims" in the *Presidio I* case, but did not assert a patent infringement counterclaim against Presidio's BB capacitors during the *Presidio I* litigation. (RSMF ¶ 26 (citing RSMF Ex. 13, ECF No. 117-7 (consisting of excerpts of court orders in *Presidio I*)).) Defendant contends that taken together, Ms. Kelly's testimony, the record evidence to which defendant refers, and ATC's failure to assert counterclaims in the *Presidio I* litigation amount to a statement and inaction by plaintiffs rising to the level of misleading conduct or silence sufficient to establish the first element of an equitable estoppel defense.

Defendant, however, ignores that the first element of equitable estoppel requires that defendant establish more than misleading conduct or silence by the patentee. In addition to showing misleading conduct or silence, a party asserting equitable estoppel must also establish that the misleading conduct or silence "le[d] the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent

against the alleged infringer." *Radio Sys. Corp.*, 709 F.3d at 1130 (quoting *A.C. Aukerman*, 960 F.2d at 1028).

The record is devoid of any evidence that Ms. Kelly's statements at the *Presidio I* trial actually had such an effect on defendant. At oral argument, defendant's counsel stated that defendant's response to an interrogatory established defendant's evidentiary basis for reliance. (*See* Arg. Tr. at 15:14-18:24 (containing argument by defendant that its response to an interrogatory, annexed as Exhibit 16 to the RSMF, forms the evidentiary basis for defendant's reliance on the Kelly testimony).)

The court does not agree. The interrogatory in question requests that defendant "describe in detail the factual bases" for its affirmative defenses, and the response does not mention Ms. Kelly's testimony at the *Presidio I* trial. (*See* Defendant's Response to Interrogatory No. 7 ("Def. Resp. to Interrog. No. 7"), RSMF Ex. 16, ECF No. 117-10, at 21-26.) Further, the response identifies Mr. Alan Devoe and Mr. Lambert Devoe as the persons most knowledgeable about defendant's affirmative defenses. (*Id.* at 22-23.) Plaintiffs deposed both Alan and Lambert Devoe, (*see generally* A. Devoe Tr., JDTA Appx. A and L. Devoe Tr., JDTA Appx. M), yet the record before the court reflects no reference to Ms. Kelly's testimony at the *Presidio I* trial in either deposition.

Additionally, although defendant asserts that its principals were in the courtroom during Ms. Kelly's testimony, the court cannot locate any evidentiary support for this assertion in the record. Neither Alan nor Lambert Devoe submitted a declaration stating that they were in the courtroom and heard Ms. Kelly's testimony in December 2009 and relied on her "live and let live" statement to infer that ATC would not enforce its '791 Patent.

These same evidentiary shortfalls preclude a finding that defendant actually relied on any misleading statement or action. Defendant points to a number of activities that it contends it undertook in reliance on its belief that plaintiffs would not enforce their rights in the '791 Patent, including investments in product development and marketing, expansion of manufacturing capabilities, and entry into building leases. (Def. Opp. at 9; RSMF ¶ 29 (citing Def. Resp. to Interrog. No. 7.) As noted, defendant submits no evidence establishing that it was actually led to infer that plaintiffs would not enforce their rights with respect to the '791 Patent, and therefore, defendant cannot establish that it relied on such an inference.

Along similar lines, there is no evidentiary link between, on the one hand, defendant's own activities which purportedly establish reliance and, on the other hand, plaintiffs' asserted statement and inaction on which defendant

claims it relied.  More specifically, defendant submits no evidence that can support a conclusion that defendant's investment and expansion activity was undertaken in direct reliance on Ms. Kelly's *Presidio I* testimony.

In sum, even on defendant's view of the facts, a critical evidentiary link necessary to establish an equitable estoppel defense is missing.  Thus, although the record contains some circumstantial evidence that might be helpful to an equitable estoppel claim, plaintiffs have not come forward with sufficient evidence to enable a reasonable finder of fact to conclude that they can establish the first two elements of equitable estoppel by a preponderance of the evidence.  Accordingly, the court will, in an exercise of its discretion, grant plaintiffs' motion for summary judgment as to the equitable estoppel defense.

## C.  Waiver

Waiver is also within the trial court's discretion. *See Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019 (Fed. Cir. 2008) (citing *A.C. Aukerman*, 960 F.2d at 1028) ("We review a district court's judgment on the equitable defense of waiver for an abuse of discretion.").  The Federal Circuit has suggested the applicability of two equitable doctrines of waiver in patent actions: "true waiver" and "implied waiver."  *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008).

Implied waiver applies where a patent owner has intentionally failed to disclose the existence of a patent "in the face of a duty to speak," and is inapplicable to the instant action. *Id.* at 1021; *see also* (Pl. Mem. at 13 n.2.)

The Federal Circuit in *Qualcomm* further suggested, but does not appear to have expressly endorsed the view, that "true waiver" consists of a "voluntary or intentional relinquishment of a known right." *Id.* at 1019. Additionally, in *Qualcomm*, the district court's advisory jury instruction stated that

> [i]n order to prove waiver, Broadcom must show by clear and convincing evidence either that Qualcomm, with full knowledge of the material facts, intentionally relinquished its rights to enforce the . . . patents [at issue] or that its conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.

*Id.* at 1020 (emphasis and citation omitted).

The Federal Circuit did not take issue with this "formulation of the law of waiver." *Id.* Additionally, although the Federal Circuit does not appear to have expressly ruled on the standard of proof required for waiver, it has upheld a finding of implied waiver where there was "clear and convincing evidence." *See id.* at 1021-22.

With respect to waiver, plaintiffs contend that the undisputed facts demonstrate that they did not discover the alleged infringement of the patents-in-suit until "shortly

before this lawsuit was filed," (Pl. Mem. at 13.) Consequently, plaintiffs cannot have knowingly and intentionally relinquished their rights with respect to their patents-in-suit.

As noted above, however, evidence in the record, when viewed in the light most favorable to defendant, could establish that plaintiffs had knowledge of the alleged infringement of the '791 Patent as early as 2004. Specifically, defendant cites an April 2004 e-mail in which, Mr. Mruz, then an ATC employee, stated that one of defendant's products uses plaintiffs' "patented BMC configuration" to achieve certain performance in capacitors. (Def. Opp. at 5, 10; RSMF ¶ 22 (citing RSMF Ex. 11, ECF No. 117-5 (including Mruz e-mail referencing "BMC configuration")).) Mr. Mruz also sent a separate e-mail in March 2004, in which he states that "Rich Monsorno's BMC Structure is used inside" Presidio's latest broadband capacitor product. (RSMF Ex. 11, ECF No. 117-5 (including Mruz e-mail with quoted language).)

Plaintiffs assert that, in the 2004 e-mails, Mr. Mruz was referring to a BMC structure as disclosed by a different Monsorno patent and not the '791 Patent, but plaintiffs' evidence leaves significant room for dispute. For instance, plaintiffs assert that in the *Presidio I* litigation, Mr. Mruz "testified that the term 'BMC' refers to ATC's U.S. Patent No. 5,576,926, not the '791 Patent." (Plaintiffs' Counter-Statement

of Material Facts ("CSMF"), ECF No. 118-1 ¶ 22.)  A review of

Mr. Mruz's trial testimony, however, indicates that Mr. Mruz

testified that U.S. Patent No. 5,576,926 (the "'926 Patent")

discloses a BMC structure, not that the term "BMC structure" can

*only* refer to the '926 Patent.  (*See* Mruz *Presidio I* Testimony,

Snell Reply Declaration ("Snell Reply Decl."), ECF No. 118-2,

Ex. 18, ECF No. 118-4, at 116:1-4 ("In fact, what we found was

the integration of an interdigitated plate MLC structure with a

BMC structure that was patented by ATC, Richard Monsorno, in

1996, U.S. Patent Number 5,576,926.").)  Defendant, however,

cites the '791 Patent and notes that, like the '926 Patent, the

'791 Patent lists Monsorno as its inventor.  (RSMF ¶¶ 22-23.)

Additionally, the '791 Patent also involves a capacitor with a

BMC structure.  ('791 Patent, ECF No. 1-3, at 2:34-46 (referring

to BMC structure in describing "preferred embodiments").)

Plaintiffs further assert that "[c]ontemporaneous

documents also confirm that [Mr. Mruz] was referring to the '926

Patent" in his email.  (CSMF ¶ 22 (citing Snell Reply Decl. Ex.

19).)  The documents to which plaintiffs cite, however, are Mruz

e-mails that were exchanged in April and May of 2003, nearly a

full year before the March-April 2004 Mruz e-mails on which

defendant relies.  (*Compare* Snell Reply Decl. Ex. 19, ECF No.

118-5 (e-mails dated April and May 2003 *with* RSMF Ex. 11, ECF

No. 117-5 (e-mails dated March and April 2004).)  Additionally,

although the 2003 e-mails and one of the 2004 e-mails involving Mr. Mruz do reference the "HubCap" product line, (*id.*), this common subject matter does not conclusively establish that Mr. Mruz's references to ATC's patented BMC structure in the 2004 e-mails were to the '926 Patent.

Finally, plaintiffs cite to Mr. Mruz's deposition testimony and assert that it establishes that Mr. Mruz did not know of the '791 Patent and had not analyzed it while he was employed by ATC. (CSMF ¶ 22.) Although this appears to accurately characterize the substance of Mr. Mruz's deposition testimony,[19] the testimony, and the evidence regarding waiver generally, must nevertheless be viewed in the light most favorable to the defendant. So viewing the evidence relevant to the waiver issue, plaintiffs have merely demonstrated the existence of a genuine dispute of material fact as to whether plaintiffs in fact formed a belief in 2004 that defendant was infringing the '791 Patent.

---

[19] In the cited portion of Mruz's deposition testimony, he is presented with an "Exhibit 9," which the transcript indicates is a patent. (Mruz Deposition Transcript, JDTA Appx. I, at 187:23-188:7.) Mruz testifies that he had never seen the patent prior to his deposition, and that he had never looked at the patent's claims, its specification, or the figures disclosed in it. (*Id.* at 187:23-188:13.) Plaintiffs' counsel then asks Mruz if he "ha[d] any knowledge of this ATC U.S. [P]atent [N]umber 6,337,791 when [he] w[as] at ATC," and Mruz responds that he did not. (*Id.* at 188:14-17.) "Exhibit 9" therefore appears to be the '791 Patent, but the court cannot conclusively determine whether Exhibit 9 is actually the '791 Patent because the excerpted testimony does not contain any express identification of Exhibit 9 as the '791 Patent, nor is Exhibit 9 before the court.

Viewed in the light most favorable to defendant, evidence before the court could also establish that plaintiffs had, at least prior to the instant action, a corporate policy, set by ATC's founder, of not enforcing its patent rights. (*See generally* Kelly Tr., RSMF Ex. 14, ECF No. 117-8.)  Taken together, this record evidence precludes a finding, at the summary judgment stage, that defendant cannot establish that plaintiffs knowingly and intentionally relinquished their rights with respect to the '791 Patent.

The evidence before the court as to the '547 Patent leads the court to a different conclusion.  The existing law on waiver strongly suggests that a party's knowledge forming the basis for waiver must be actual and full.  *See Qualcomm*, 548 F.3d at 1019-20 (quoting district court advisory jury instruction stating that defendant asserting waiver must prove, in relevant part, that plaintiff "with full knowledge of the material facts, intentionally relinquished its rights to enforce the . . . patents [at issue] or that its conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished" (emphasis and citation omitted)).

Although defendant submits evidence that could affirmatively controvert plaintiffs' assertion that they were unaware of the alleged infringement of the '791 Patent until

just prior to the initiation of the instant action, defendant
does not submit any such evidence with respect to the '547
Patent.  Instead, the evidence to which defendant points in
opposing summary judgment on waiver relates to capacitors with a
"BMC structure" and those covered by a "Monsorno patent."  (*See*
Def. Opp. at 10.)  The '547 Patent, however, does not
incorporate a BMC structure and lists "Retseptor" as the
inventor.  (*See generally* '547 Patent and *compare* '547 Patent
(containing no reference to BMC structure) *with* '791 Patent at
2:34-46 (referring to BMC structure).)  Further, Ms. Kelly's
*Presidio I* testimony, taken in the light most favorable to
defendant, could support an inference that plaintiffs believed
defendant was infringing multiple of their patents, including
perhaps the '547 Patent.  (*see* Kelly Tr. at 26:14-22 ("As *an*
example, one of Presidio's products actually infringes on our
Monsorno BMC Patents." (emphasis added)).)  However, it would
not be reasonable to infer from Ms. Kelly's testimony that
plaintiffs *specifically* believed defendant was infringing the
'547 Patent.  There is therefore no evidence in the record that
would enable a reasonable finder of fact to conclude that
plaintiffs, with full knowledge of the import of their actions,
voluntarily relinquished any right or rights as to the '547
Patent.

In an exercise of its discretion, the court grants summary judgment to plaintiff, precluding defendant from asserting a waiver defense with respect to the '547 Patent.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. Specifically:

(1)    Defendant's motion for summary judgment is GRANTED as to plaintiffs' claim for damages for pre-suit infringement of the '547 Patent from 1999 onward.

(2)    Defendant's motion for summary judgment is DENIED as moot with respect to plaintiffs' claim for infringement of the '879 Patent, which has been invalidated by PTAB and as such is a nullity.  This denial is without prejudice to defendant's ability to raise issues related to the '879 Patent in arguing plaintiffs' bad faith in bringing the instant action.  Plaintiffs' claims for infringement of the '879 Patent and of claim 1 of the '791 Patent are DISMISSED.

(3)    Defendant's motion for summary judgment is DENIED as to plaintiffs' claim for lost profit damages.

(4)    Defendant's motion for summary judgment is GRANTED as to plaintiffs' claim for damages under 35 U.S.C. § 284 with respect to the '547 Patent, but DENIED as to plaintiffs'

claim for damages under 35 U.S.C. § 284 with respect to the '791 Patent.

(5)    Defendant's motion for summary judgment is DENIED as to defendant's claim that the '547 Patent is indefinite.

(6)    Defendant's motion for summary judgment is DENIED as to plaintiffs' claim for infringement of the '547 Patent pending further claim construction of the term "terminations" and without prejudice to defendant's ability to renew its motion as to infringement of the '547 Patent.

(7)    Defendant's motion for summary judgment is DENIED as to plaintiffs' claim for infringement of the '791 Patent.

Additionally, plaintiffs' motion for summary judgment as to defendant's equitable defenses is GRANTED in part and DENIED in part.  Specifically:

(1)    Plaintiffs' motion for summary judgment as to the defense of laches is GRANTED, without prejudice to defendant's ability to argue laches in opposing an ongoing royalty or an injunction should this action reach the remedial stage.

(2)    Plaintiffs' motion for summary judgment as to the defense of equitable estoppel is GRANTED.

(3)    Plaintiffs' motion for summary judgment as to the defense of waiver is DENIED with respect to the '791 Patent and GRANTED with respect to the '547 Patent.

As set forth herein, the parties are directed to confer and, within seven (7) days of entry of this order, submit a joint letter to the court setting forth a joint plan for claim construction proceedings with respect to the word "terminations" as recited in the '547 Patent, including a briefing schedule and a statement as to whether a hearing is necessary. Because of the importance of further claim construction with respect to the word "terminations" in crystallizing the issues that may remain for trial, the court will not direct the parties to commence trial preparations at this time.

**SO ORDERED.**

Dated:   March 27, 2018
         Brooklyn, New York

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge