UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
AMERICAN TECHNICAL CERAMICS CORP.
and AVX CORPORATION,

      *Plaintiffs*,

  -against-

PRESIDIO COMPONENTS, INC.,

     *Defendant*.
---------------------------------X

**MEMORANDUM & ORDER**

14-CV-6544(KAM)(GRB)

**MATSUMOTO, United States District Judge:**

     A unanimous jury rendered a verdict in favor of plaintiffs, American Technical Ceramics Corp. ("ATC") and AVX Corporation ("AVX," and together with ATC, "Plaintiffs"), and found defendant, Presidio Components, Inc. ("Presidio" or "Defendant"), liable for infringing United States Patent No. 6,144,547 ("'547 Patent"), and United States Patent No. 6,337,791 ("'791 Patent," together with the '547 Patent, the "Patents-in-suit").[1]  As prevailing parties, Plaintiffs seek attorneys' fees from Presidio pursuant to 35 U.S.C. § 285, totaling $367,078.29, as compensation for conduct that "prolonged and complicated" this case.  For the reasons stated below, Plaintiffs' motion is DENIED.

---

[1]    Each party thereafter filed post-trial motions, which are the subject of a Memorandum and Order issued earlier today.  (*See* ECF No. 237.)

**BACKGROUND**

**I.   The Parties**

Plaintiffs commenced this action on November 6, 2014 (ECF No. 1, Complaint), accusing Presidio of infringing the Patents-in-suit.  ATC is a wholly-owned subsidiary of the publicly traded AVX Corporation, and is based in Huntington Station, New York.  AVX owns the '547 Patent, which it licensed to ATC in November 2014, and ATC owns the '791 Patent.  (*See* ECF No. 79, First Claim Construction Order ("FCCO") 2.)  Presidio is a privately-owned company based in San Diego, California.

All parties manufacture electrical devices, including capacitors, which are electronic components that store and release energy within a circuit, and are used in a variety of electrical systems, including consumer electronics.  (*Id.*) Capacitors typically consist of two parallel conductive, usually metal, plates separated by a non-conductive, insulating material known as a "dielectric."  (*Id.*)  The Patents-in-suit relate to "multilayer ceramic capacitors" ("MLCCs"), which are created through the combination of multiple capacitors by stacking several layers of conductive material and non-conductive, or dielectric, material.  (*Id.* 2-3.)  The parties make and sell MLCCs.  (*Id.* 3.)  Presidio manufactures products known as BB capacitors, which Plaintiffs contend practice, and as such, infringe the Patents-in-suit.

2

## II.   Claim Construction

### A. First Claim Construction

On August 31, 2016, the court held a claim construction, or *Markman* hearing, at which the parties presented oral argument and expert testimony to explain their proposed constructions of certain claims in the Patents-in-suit.   (FCCO 3.)   On November 7, 2016, the court entered its claim construction order, setting forth how those disputed terms would be construed.

In the FCCO, the court considered, *inter alia*, the term "substantially L-shaped terminations," which appears in all claims of the '547 Patent and describes the appearance and structure of the terminations that devices practicing the '547 Patent would have.   The court concluded that the term was to be construed "in accordance with its ordinary meaning, *i.e.*, as a termination that is substantially or largely L-shaped, but not wholly L-shaped."   (*Id.* 20-21.)   In reaching this construction, the court rejected Defendant's argument that "substantially L-shaped" would not "sufficiently distinguish the structure from U-shaped terminations," and instead determined that "[t]erminations having a U-shape are already excluded by the ordinary meaning of substantially L-shaped, because a structure with terminations that extend around the lateral sides of a

device body would not be L-shaped."  (*Id.* 20 (internal quotation marks omitted).)

Also relevant to Defendant's motion, at the claim construction stage, the court considered the '547 Patent's statement, recited in each of its claims, that the "substantially L-shaped terminations" extend "negligibly over a top surface" of the device body.  The court construed "negligibly over a top surface" to mean "a small amount of termination material is formed on a top surface of the device body."  (FCCO 22.)  The court noted that "[b]y definition, the top configuration [of the termination] must be smaller than the bottom configuration in order for the top termination portion to extend 'negligibly,' and for the terminations as a whole to appear 'substantially L-shaped.'"  (*Id.*)  The parties did not include the term "terminations" in the Joint Disputed Claim Terms Chart.  (*See generally* ECF No. 48-1, Joint Disputed Claim Terms Chart ("JDTC").)  Further, the parties agreed that terms "not specifically identified" in the chart should be "given their plain and ordinary meaning."[2]  (ECF No. 48, Notice of Filing of Joint Disputed Claim Terms Chart ("JDTC Notice") 1.)

---

[2]     At the *Markman* Hearing, Dr. Stanley R. Shanfield, expert witness for Plaintiffs, described terminations as "the things at the ends of the capacitor," and Dr. Michael S. Randall, expert witness for Defendant, testified that the capacitor's electrodes are connected to the termination end.  (ECF No. 80, *Markman* Hearing Transcript, 23:1-10 and 98:17-20.)

4

B. **Summary Judgment**

On March 27, 2018, the court issued a Memorandum and Order granting in part, and denying in part, the parties' cross-motions for summary judgment. (*See generally* ECF No. 126, Summary Judgment Order ("SJO").)  Presidio moved for judgment that the accused devices do not infringe the '547 Patent, as they do not incorporate "substantially L-shaped terminations" or "terminations . . . extending negligibly over a top surface of the device body," limitations required by all claims of the '547 Patent. (ECF No. 120-1, Presidio's Memorandum in Support of Motion for Summary Judgment ("Def.'s MSJ") 23-31.)

As the parties' articulated and refined their positions, it emerged that the proper construction of "terminations" was "critically important to, if not dispositive of" Presidio's motion, in two respects. (SJO 46.)  *First*, the scope of "terminations" was essential to determining whether the accused products had "substantially L-shaped terminations," as required by the '547 Patent. (*Id.*)  Presidio stated, without dispute, that Plaintiffs' infringement theory relied on "external electrodes, or surface pads, which are located on the bottom of the accused products, forming part of the device termination and thereby constituting the lower portion of the

'L.'" (*Id.*)[3]  Embedded in this argument were two subsidiary

contentions, which Presidio believed were supported by the

record, including deposition testimony of two of Plaintiffs'

engineers, and the expert report Dr. Michael Randall, Presidio's

technical expert.  (Def.'s MSJ 46-47.)  Presidio argued that the

capacitor's surface pads could be considered part of the

termination.  (SJO 46.)  Presidio further argued that the

accused devices have U-shaped terminations, not L-shaped ones,

thereby implying that the "'dipping process used for all of the

accused devices,' which is not used to apply surface pads,

constitute[d] the sole means for applying terminations, at least

with respect to the accused products." (*Id.* 47.)  Plaintiffs

countered that "the surface pads or external electrodes of the

accused capacitors are terminations." (*Id.*)  Dr. Hillman,

Plaintiffs' technical expert, opined that "the combined

structure including dipped end terminations and surface pads

form[ing] the capacitor's termination structure." (*Id.*

(internal quotation marks and brackets omitted).)

       *Second*, it also became clear that the proper

construction of "terminations" was critical to determining

whether the accused devices' terminations extended "negligibly

over a top surface." (*Id.*)  As held in First Claim Construction

Order, "the top configuration must be smaller than the bottom

---

[3]      Unless stated otherwise, citations to the court's prior orders omit
citations therein to the internal court record.

configuration in order for the top termination portion to extend 'negligibly,' and for the terminations as a whole to appear 'substantially L-shaped.'" (FCCO 22.) Because the surface pads are situated on the bottom of the accused products' device body, "a comparison of the top and bottom termination configurations of the accused devices necessarily require[d] clarity as to whether surface pads are part of the termination structure." (SJO 48.)

The infringement claims based on the '547 Patent thus hinged on a proper construction of "terminations," and the court resolved to construe the term "objectively and without reference to the accused device[s]," as a condition precedent to resolving Presidio's summary judgment motion. (SJO 48-49 (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).) Though the parties agreed to construe "terminations" according to its "plain and ordinary meaning," (JDTC Notice 1), neither the record nor the parties satisfactorily conveyed such meaning. (SJO 49.) In light of these barriers to construction, not to mention Federal Circuit case law frowning on judicial claim construction absent a hearing, the court was disinclined to construe "terminations" without affording the parties an opportunity to elucidate their positions in a second *Markman* hearing. (*Id.* 50.)

7

## C. Second Claim Construction

The parties agreed in their proposed constructions
that "terminations" were "(i) structures that are (ii)
conductive and (iii) external to the capacitor device body."
(ECF No. 136, Second Claim Construction Order ("SCCO") 14.)  The
court rejected Presidio's proposed additional limitation,
namely, that terminations must "provid[e] electrical and
mechanical connection to the device's conductive
patterns/electrodes[.]"  *(Id.* 14-15 (internal quotation marks
omitted).)  The court reasoned that Presidio's position lacked
support in the relevant claims' language, neither of which
indicated that terminations provide electrical and mechanical
connection to the capacitor device's conductive patterns or
electrodes.  (*Id.* 16.)  The court also considered the Patent's
specification, and found Presidio's reliance on it misplaced.
Presidio argued that the '547 Patent "expressly excludes
external plating, one of many types of conductive structures
arranged externally on the device body, from 'terminations.'"
(*Id.* 21.)  Contra Presidio's position, the court noted the lack
of express language in the '547 Patent excluding plating from
the termination structure.  (*Id.*)  Presidio's remaining
arguments were also deemed unavailing, and Plaintiffs'
construction of "terminations" was adopted.

Presidio sought to leave to file a successive motion for summary judgment after the Second Claim Construction Order was entered. (*See* Order dated Nov. 27, 2018.) In letter motions, the parties disputed whether there was a genuine issue of fact that the accused devices incorporate "substantially L-shaped terminations" or "terminations . . . extending negligibly on or over a top surface of the device body," and thus, whether a trial was necessary to determine if the accused devices infringe the '547 Patent. (*See* ECF No. 138, 139.) The court denied Presidio's motion in a docket order. (Docket order dated Dec. 18, 2018.)

## III. *Daubert* Order

On May 30, 2019, the court ruled on the parties' evidentiary motions pursuant to *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579 (1993) and Federal Rule of Evidence 702. (ECF No. 179, *Daubert* Order.) In pertinent part, Presidio challenged the testimony of Plaintiffs' technical expert, Dr. Craig Hillman. (*Id.* 2, 31.) According to Presidio, Dr. Hillman "evaluated a minimal and insufficient number of capacitors, no more than 100," out of the millions accused of infringement. (*Id.* 31.) Presidio contended that Dr. Hillman's failure to explain why the examined capacitors were representative of all infringing units, precluded him from reliably opining that the capacitor sample he reviewed was statistically sufficient to

9

establish the accused capacitors infringed as a whole.  (*Id.*)
Presidio asserted that Dr. Hillman's analysis of thirty
capacitors out of approximately 15 million accused units,
represented too insignificant a number to support infringement.

In response, Plaintiffs countered by highlighting
Presidio's own admissions and representations in the instant
litigation.  For example, Plaintiffs argued that Dr. Hillman
relied on Presidio's representation in discovery that the
capacitors produced were "representative" samples.  (*Daubert*
Order 36.)  In addition, Presidio's own expert, Dr. Randall,
repeatedly formed opinions of the accused products based on a
limited sample he deemed "representative," and not by analyzing
every capacitor in each lot.  (*Id.* 38.)

The court ultimately rejected Presidio's arguments.
Not only did Presidio fail to cite controlling authority "for
the proposition that a small sample size warrants exclusion by
law," but its argument that each capacitor was so different that
no analysis for one or two samples could be extrapolated to
other capacitors was discarded as absurd.  (*Id.*)  Presidio's
standard, the court noted, would effectively "require Dr.
Hillman to analyze all of the . . . accused capacitors to
provide an admissible opinion."  (*Id.* 41.)

"Even more glaring" in the court's view, was Presidio's attempt to nullify the reasonably clear meaning of its own discovery response:

> In response to plaintiffs' request for ten samples of BB and SL capacitors in each relevant case size, Presidio stated "representative samples of Presidio's Surface Mount Buried Broadband capacitors" and "Single Layer capacitors" had been produced.   At oral argument, counsel for defendant stated "representative samples" meant, in fact, "nothing," but was hard-pressed to explain this anomaly.   As such, Presidio has not established that its manufacturing process is so variable that each capacitor in a given lot is materially different from the rest of the capacitors in the lot and, furthermore, that plaintiffs were aware of this variability based on defendant's discovery responses.

(Daubert Order 43-44.)   In sum, the court found that Dr. Hillman reliably extrapolated his analysis for each examined capacitor to its respective lot, and in doing so, relied on Presidio's own discovery admissions, expert testimony, and corporate documents. (*See generally id.* 44-48.)

Presidio also advanced a second theory for exclusion based on Dr. Hillman's purportedly unreliable methods.   Presidio argued that Dr. Hillman took no measurements of the accused capacitors to determine if each practiced the '547 Patent's limitation of "termination material extending negligibly over the top surface." (*Daubert* Order 49.)   Presidio further argued that Dr. Hillman was required to take measurements in the millionths of an inch.  (*Id.* 49-50.)   The court found the

premise of Presidio's contention, that "plaintiffs *must* prove
infringement through measurement of the terminations and
relevant dielectric layers," as contrary to the construction of
the term "negligibly," and other relevant claim terms, which did
not require a precise measurement.  (*Id.* 51-52.)  As for those
claims that did require an approximate numerical limit,
measurements could be ascertained by reference to Presidio's
advertising materials, which listed uniform dimensions for the
accused capacitors and thus provided sufficient basis to
determine whether the accused products satisfied the claim's
limitations.  (*Id.* 52.)

Presidio also disputed Dr. Hillman's methodology for
determining whether the first and second dielectric layers are
"co-extensive," *i.e.* extend over the same area, as required by
the '791 Patent.  (*Daubert* Order 53-54.)  Presidio found fault
with Dr. Hillman's approach, which involved taking cross-
sections of two capacitors, one lengthwise and one widthwise,
and highlighting the first and second dielectric layers to
demonstrate that the layers share the same dimensions.  (*Id.*
54.)  This method was too narrow, Presidio argued, because it
ignored the possibility that there could be "a point along the
width of the capacitor where the width of the second dielectric
layer is different than that of the first dielectric layer," in

which case, "the widths of the two layers would not be coextensive." (*Id.*)

As with Presidio's other challenge, its attack on Dr. Hillman's co-extensiveness analysis was thwarted by earlier discovery responses, particularly its admission "that two layers in a depicted capacitor's cross-section were co-extensive, without raising the arguments it does in the instant motion, and without first requiring plaintiffs to provide the relevant measurements of the two layers." (*Daubert* Order 56-57.) Presidio's attempt to cabin the damaging admission also failed. Presidio maintained it had "not admit[ted] that every image of that single capacitor shows the layers are coextensive." (*Id.* 57 (emphasis omitted).) As before, the court refused to accept the logical implications of Presidio's position "that an infringement analysis must consider the measurements at every point along the relevant dielectric layer." (*Id.*) This approach, the court observed, "would require Dr. Hillman to have measured the capacitors at innumerable points to determine if the layers are coextensive." (*Id.*) The court similarly rejected Presidio's argument that imperfections or defects in the manufacturing process could render dielectric layers non-coextensive to preclude an infringement finding. (*Id.*)

The court thus denied Presidio's motion to preclude Dr. Hillman's testimony, but stipulated that Presidio could still challenge him on cross-examination to probe his chosen sample size, and the applicability of his analysis to unexamined accused products.  (*Daubert* Order 58.)

## IV. Trial

After four-and-a-half years, the case proceeded to trial in June 2019.  Plaintiffs impugn Presidio's trial conduct for unnecessarily prolonging the trial, and necessitating multiple sidebars, sustained objections, and curative instructions.  (Pls.' Mot. 15.)

### A. Supplemental Invalidity Contentions

On January 30, 2019, the court denied Presidio's motion to supplement its invalidity contentions regarding the '547 Patent with a new prior art reference.  (ECF No. 142, Order Estopping Supplemental Invalidity Contention ("Estoppel Order").)  Pursuant to 35 U.S.C. § 315(e)(2), the Estoppel Order barred Presidio from raising invalidity grounds in either supplemental contentions or a revised expert report, that it did not previously include in its petition for *inter partes* review ("IPR") to the U.S. Patent and Trademark Office ("PTO").  (*Id.* 3-4.)  The court also noted Presidio's lack of specifics concerning the new prior art it planned to introduce.  (*Id.* 4.)

14

At trial, while directly examining Mr. Alan Devoe, Presidio's President and corporate designee, defense counsel attempted to introduce a new patent reference, U.S. Patent No. 5,740,010—"a patent of a capacitor [Presidio] made . . . in the early '90s"—into evidence as Trial Exhibit FD.  (Tr. 1115:5-24.)[4] Plaintiffs' counsel objected.  (*Id.* 1116:4.)  At sidebar, Plaintiffs questioned the relevancy of Exhibit FD, and suggested that, based on its image, "this is just an attempt to end run the Court's order about not supplementing invalidity contention[s]."  (*Id.* 1117:2-1118:5.)  Defendant claimed the exhibit, which had been on Presidio's exhibit list without objection for a "long time," was intended to demonstrate Presidio's "experience with terminations that are only three sides and not all four sides[.]"  (*Id.* 1117:13-18.)

Sustaining Plaintiffs' objection, the court agreed that Exhibit FD was irrelevant because it had no demonstrated relationship to the accused products, and further risked confusion and delay by introducing a previously unheard-of

---

[4]     The caption "Tr. _" refers to the transcript for the trial held in this action from June 10 through June 21, 2019.  The transcript for each day's proceedings appears on the docket as follows: Day 1 – June 10, 2019 (ECF No. 209); Day 2 – June 11, 2019 (ECF No. 210); Day 3 – June 12, 2019 (ECF No. 211); Day 4 – June 13, 2019 (ECF No. 212); Day 5 – June 14, 2019 (ECF No. 213); Day 6 – June 17, 2019 (ECF No. 235); Day 7 – June 18, 2019 (ECF No. 219); Day 8 – June 19, 2019 (ECF No. 236); Day 9 – June 20, 2019 (ECF No. 204); Day 10 – June 21, 2019 (ECF No. 234).  Citations to the trial record herein refer to the relevant page and line number of the collective transcript.

product to the jury.  (Tr. 1118:6-16.)  After the court ruled,

Presidio's counsel had the following exchange with Mr. Devoe:

> **Q:** And so in that situation, the termination would just have three sides, not five, correct?
>
> **A:** Yes.
>
> **Q:** And so would that be something that [Presidio] would make with a dipping process or by some other method?
>
> **A:** Oh, if we – if we wanted only three sides?
>
> **Q:** Correct.
>
> **A:** There was a product that we were making starting about 1990 or '91 that had this characteristic.
>
> . . .
>
> **Plaintiffs' Counsel:** Objection, Your Honor.
>
> **The Court:** Okay. Yes. I am going to sustain that objection for the reasons discussed at sidebar.

(*Id.* 1120:22-1121:10.)

Plaintiffs' counsel elaborated on his objection at

the ensuing sidebar:

> **Plaintiffs' Counsel:** Your Honor, I'm candidly shocked that that testimony was just elicited after our sidebar. I clearly articulated my concern about the document they raised, and instead of showing the document, they came and started testifying about it. It's highly prejudicial. It has no relevance to the case. It's an attempted end run on the Court's prior order denying a request to supplement invalidity contentions, eliciting testimony that the accused product has a termination structure that was present in their own device in the 1990s. It's highly prejudicial, and I'm --
>
> **The Court:** What relief would you like? Should we start sanctioning lawyers who disobey my order? I mean,

16

look. I'm not kidding around. I made a ruling. I thought you understood the ruling. We have repeated [] disregard[] and disrespect of the efforts that we've made to take time at sidebar to discuss the reasons why objections are made and why they are either sustained or overruled. This is not the first time it's happened. *I expressed my concerns about this behavior that has gone on throughout this trial, indeed, through this litigation and how really, I will say, sanctionable it is.* But I really need you to put a stop to this and have you all understand I am serious. I am not one to scream and yell, but *I will sanction lawyers who repeated[ly] disobey rulings and orders.* And I don't know what else to tell you, except that you have been warned. And if I've made a ruling, do not contravene it, please. All right?

**Defense Counsel:** I understand. You –

**The Court:** I am not ascribing any intention to anybody. It doesn't matter to me what the inten[t]ion is. I am concerned with the effect of having evidentiary rulings made out of the presence of the jury. Some of these took a lot of work on everybody's part, a lot of money for attorneys' fees, and yet we are going over again and again . . . . It becomes very, very frustrating. *And I know at least half of my colleagues would have had you sanctioned long ago.* I'm trying to [be] tolerant, but I am reaching my end point. All right?

(Tr. 1122:16-1124:6 (emphasis added)).)

### B. "Negligibly over a top surface"

In the claim construction stage, the court interpreted "negligibly over a top surface," as recited in the '547 Patent, as "a small amount of termination material is formed on the top surface of the device body." (FCCO 21-22.) The court also foreclosed Presidio's proposed limitation that, "the amount must also be small in relation to the termination material extending over a bottom surface of the capacitor device body." (*Id.* 21

17

(alteration omitted).)  As the case advanced, Presidio tried to impose finite numerical boundaries on the permissible size of the top termination material.  The court rebuffed these attempts in the *Daubert* Order, and definitively foreclosed an extraneous numerical limitation by holding "no expert may testify to measurable limitations of termination material on the top surface, as the court has declined to read a numerical limit into the term 'negligibly over a top surface.'"  (*Daubert* Order 11.)  The *Daubert* Order forbade Presidio's expert from testifying that Plaintiffs "promoted" a maximum of 0.05 mm of termination material, or other determinate limitations, over the top surface.  (*Id.* 11–12.)  On the other hand, the court made clear it would countenance expert testimony describing the termination material's dimensions.  (*Id.* 12.)

Presidio came close to trespassing the permissible bounds of argument at trial.  Presidio's counsel averred in his opening statement that "negligibly" refers to something that can be neglected.  (Tr. 168:19.)  The next day, Plaintiffs' counsel sought a curative instruction to address Presidio's apparent effort to "reconstrue" the term "negligibly."  (Tr. 229:3-19.)  The court agreed, noting the jury would receive a claim construction charge before deliberations, and warned Presidio to "avoid twisting 'negligibly over the top surface' to imply neglectful behavior or neglect."  (*Id.* 229:20-24.)

18

Presidio flew close to the proverbial sun several times thereafter.  For example, on cross, Presidio's counsel asked Dr. Hillman if the '547 Patent's specification discussed "that the top lands typically will not exceed less than 2 mils[.]"  (*Id.* 865:17-19.)  Plaintiffs objected to the implied numerical limitation as contravening the *Daubert* Order. (*Id.* 867:2-7; *see also id.* 867:9-13 ("This line of questioning is objectionable because it's designed to suggest to the jury that the claims of the '547 Patent are not infringed, if the amount of termination material on the top is greater than .05 millimeters.").)  Presidio's counsel insisted his question had no bearing on infringement, but rather, was intended to develop Presidio's indefiniteness defense.  (*Id.* 867:20-868:1 ("[W]hat we don't know is how far that claim term can stretch and if it can stretch beyond what's disclosed as an example in the specification, and if he can't identify how far it can possibly stretch, then it's indefinite; and so it's directly related to that issue, and, I assure you, we will not suggest that to infringe it has to be less or equal to this dimension .05 millimeters.").)

Plaintiffs' objection was sustained.  Although the court found Presidio's inquiry irrelevant to infringement, Dr. Hillman's expert subject matter, the door was left open for defense counsel to inquire the same of Dr. Shanfield,

19

Plaintiffs' expert witness on invalidity.  (Tr. 868:6-10 ("Why don't we save that for later then. [Dr. Hillman] shouldn't be testifying about this issue, if it goes to your indefiniteness argument, and I don't think he went much into this on his direct.").)  The court sustained further objections to Presidio's questioning of Dr. Hillman, including: (1) whether he measured the top termination of any capacitor (*id.* 873:7-10); (2) if "significant amount" is different than "negligible" (*id.* 934:22-935:7); and (3) whether he measured the top terminations on the BB capacitors (*id.* 943:7-25).

Presidio's expert, Dr. Randall, later testified regarding the top termination "in the context of the 0.05 millimeter dimension," prompting another objection from Plaintiffs' counsel. (Tr. 1595:11-16.)  Presidio's counsel assured the court that Dr. Randall was merely describing the BB capacitors in the context of the specification, and noted that Dr. Randall had prefaced his testimony by acknowledging that the relevant claim term had no numerical limit in particular.  (*Id.* 1596:12-19.)  Nonetheless, the court issued a curative instruction to mitigate the risk of confusion:

> The jury is instructed that you may not apply the numerical values that you may find in the specification part of the '547 to your analysis of whether or not the BB capacitors violate the '547 Patent with respect to the termination material extending negligibly over the top surface. And secondly, members of the jury, you may not conclude

> that the BB capacitors do not infringe simply because
> they have more than .05 millimeters of termination
> material on the top.

(*Id.* 1605:2-11.)

### C. "Substantially L-shaped terminations"

The court construed the term "substantially L-shaped,"
as recited in the '547 Patent, to mean "substantially or largely
L-shaped, but not wholly L-shaped." (FCCO 20.) The *Daubert*
Order clarified that "Dr. Randall may not offer an opinion that
a capacitor with *any* termination material on the lateral sides
of the accused product would not be 'substantially L-shaped' and
thus could not infringe the '547 Patent." (*Daubert* Order 9
(emphasis in original).) Dr. Randall was further precluded from
testifying that "termination material on the latter side of the
accused product renders the terminations not 'substantially L-
shaped.'" (*Id.* 10.)

At trial, Presidio asked Dr. Hillman to confirm that,
as stated in the '547 Patent itself, "terminations 16 and 18 do
not extend around the lateral sides of device body 14." (Tr.
875:23-25; *see* ECF No. 224-15, '547 Patent, col. 3 ll. 1-2; *id.*,
Figure 2.)[5] Plaintiffs' counsel objected, based on an apparent

---

[5]     For context, Presidio's line of questioning referred to Figure 2 of the
'547 Patent, depicted in the image below, with the device body designated as
**14**, and the terminations designated as **16** and **18**:

suspicion that Presidio was "suggest[ing] to the jury that a capacitor with termination material on the lateral sides cannot infringe," contra the court's construction of "substantially L-shaped termination," and the *Daubert* Order.  (Tr. 877:2-10.) The court agreed and curatively instructed as follows:

> [F]or Claim 1 there is no specific limitation on the amount of termination material on either the top or lateral sides. You'll receive further instruction before you deliberate, but right now we're just trying to make sure we stay focused on the things that matter. You may proceed.

(*Id.* 882:9-14.)

Presidio later re-introduced the same disclosure during Dr. Randall's direct examination, causing Plaintiffs to lodge yet another objection.  (Tr. 1808:21-24.)  Presidio's counsel maintained at sidebar that his inquiry sought only to show the relevant claim term's indefiniteness.  (*Id.* 1810:16-19 ("[A]ll I'm trying to demonstrate is that there is no description in the patent as to the scope of how much termination there can or cannot be on specific surfaces and that is strictly related to the issue of indefiniteness.").) Presidio maintained the presence of side termination material



was at least relevant to the question of infringement, whilst conceding that "the mere presence of the lateral side terminations does not," taken alone, "render a termination . . . not substantially L-shaped." (*Id.* 1812-13.)  The court issued another curative instruction, which incorporated the caveats noted by Presidio.  (*Id.* 1815:3-13.)

### D. Evidence from Prior Litigation

In a pre-trial motion *in limine*, Plaintiffs moved to preclude Presidio from introducing evidence or eliciting testimony regarding two prior litigations between the parties in the Southern District of California, each of which concerned a separate, unrelated patent: *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08-cv-0335 (S.D. Cal. 2008) ("*Presidio I*") and *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 14-cv-2061 (S.D. Cal. 2014) ("*Presidio II*," and collectively, with *Presidio I*, "California Litigations").  (ECF No. 181, Order re: Motions *in Limine* ("MIL Order") 7-8.)

While cross-examining Plaintiffs' damages expert, Presidio's counsel attempted to confront him with a damages report from the California Litigations.  (Tr. 1041:7-17.) Plaintiffs objected and requested a sidebar.  (*Id.* 1041:21-22.) Presidio did not conceal the document's source, but pointed out that any indicia of its origins had been removed.  (*Id.* 1043:11-13.)  Defense counsel further maintained that the document's

23

sole purpose was to impeach Dr. Woods' lost profits testimony,
by showing that he made a prior inconsistent statement about the
profit per unit of a given ATC capacitor.  (*Id.* 1043:7-10.)
Presidio pledged not to ask the witness about the context of the
document.  (*Id.* 1043:14-17.)  Plaintiffs nonetheless maintained
steadfast opposition to introducing the damages report for any
purpose.  The court sustained Plaintiffs' objection, reasoning
that the use of the damages report ran afoul of the MIL Order's
prohibition against references to the California Litigations.
(*Id.* 1044:23-1045:6.)

### E. Other Unreasonable Conduct

Plaintiffs note other sustained objections at trial
regarding: (1) the manner of Presidio's questioning, including
asking previously-answered questions (Tr. 381-82, 410, 419-20,
491-92, 493-97, 498-500, 845, 852, 943, 1027, 1048, 1058, 1510,
1868, 2258); (2) asking leading questions on direct examination
(*id.* 1279- 80, 1410, 1760, 1824, 2001); and (3) other
inappropriate behavior (*id.* 363 ("Let him finish. Manners,
okay."), 417:19-418:2, 541-42 ("I think blindside is a better
word."), 1016:11-20, 1035:2-14, 1920:41-1921:1, 2004:3-11).

### LEGAL STANDARD

A "[district] court in exceptional cases may award
reasonable attorney fees to the prevailing party."  35 U.S.C. §
285.  In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the

24

Supreme Court held that an exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  572 U.S. 545, 554 (2014).

A district court undertakes the "exceptional case" analysis in the case-by-case exercise of its discretion, considering the totality of the circumstances. *Id.; Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1306 (Fed. Cir. 2018).  "[T]here is no precise rule or formula" for considering the totality of the circumstances. *Octane Fitness*, 572 U.S. at 554 (internal quotation marks and alteration omitted) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)).  A district court may weigh factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case)[,] and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 554 n.6 (internal quotation marks omitted) (citing *Fogerty*, 510 U.S. at 534 n.19). Section 285 "imposes no specific evidentiary burden," and is instead "a simple discretionary inquiry[.]"  *Id.* at 557.  Only once the court determines that the case is exceptional, can it then determine whether an award of fees is justified. *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012).

At bottom, "an award of attorney fees under § 285 is not intended to be an 'ordinary thing in patent cases,' and [] it should be limited to circumstances in which it is necessary to prevent a 'gross injustice' or bad faith litigation." *BroadSoft, Inc. v. CallWave Commc'ns, LLC*, No. CV 13-711-RGA, 2019 WL 3750817, at *6 (D. Del. Aug. 8, 2019) (quoting *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003), and *Microsoft Corp. v. WebXchange Inc.*, 715 F. Supp. 2d 598, 603 (D. Del. 2010)).  Attorneys' fees will not be imposed as "a penalty for failure to win a patent infringement suit." *Octane Fitness*, 572 U.S. at 548.  After all, "[t]he legislative purpose behind [35 U.S.C.] § 285 is to prevent a party from suffering a gross injustice, not to punish a party for losing." *Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (citation and internal quotation marks omitted).

## DISCUSSION

There is no dispute that Plaintiffs are prevailing parties.  The jury held Presidio liable for all asserted infringement claims, rejected its invalidity contentions,[6] and consequently, awarded Plaintiffs damages.  This motion thus turns on whether or not Plaintiffs can establish that this was

---

[6]     The jury returned an advisory verdict finding one claim term indefinite (ECF No. 220-9, Verdict Sheet, Question 12), but the court subsequently determined that Presidio failed to prove indefiniteness at trial by clear and convincing evidence.  (*See* ECF No. 214, Memorandum and Order Denying Motion to Vacate, dated October 16, 2019.)

an "exceptional case."  For the reasons that follow, the court finds they have not.

## I.   Exceptional Case

As noted above, a prevailing party seeking attorneys' fees under the Patent Act must demonstrate that the underlying litigation was an exceptional case.  *See* 35 U.S.C. § 285. *Octane Fitness* established a two-pronged disjunctive test to establish the exceptional case requirement.  The prevailing party can demonstrate entitlement to fees, either by detailing the substantive weakness of the non-movant's overall litigation position, or by showing that the non-movant litigated the case in an unreasonable manner.  The court finds Plaintiffs have demonstrated neither.  As this case is not exceptional, Plaintiffs are not entitled to an award of attorneys' fees.

### A. Substantive Strength of Litigation Position

Plaintiffs all but concede that their request for attorneys' fees rests entirely on Presidio's litigation conduct. (ECF No. 225, Pls.' Reply 9-10.)  Notwithstanding this concession, the nature of this case warrants further contemplation.  Doing so heeds the Supreme Court's admonishment to consider the totality of circumstances when shifting fees under § 285.

As it often is with patent litigation, this case was "long, expensive, and complex."  *TNS Media Research LLC v. TiVo*

27

*Research & Analytics, Inc.*, No. 11-CV-4039 (KBF), 2018 WL 2277836, at *4 (S.D.N.Y. May 18, 2018) (record citation and internal quotation marks omitted).  In the six years since Plaintiffs commenced suit, there have been, *inter alia*, two claim constructions, a stay pending IPR, cross-motions for summary judgment, thoroughly-briefed evidentiary and *Daubert* motions, not to mention extensive discovery.  This all culminated in a contentious and complex ten-day jury trial.  The verdict did not end matters, however, a point made obvious by the flurry of post-trial motions that followed.  (*See* ECF Nos. 220-234.)  Notably, the court has ordered a new trial limited to the issue of damages based on a reasonable royalty, which forestalls a definitive resolution to this case for perhaps another year, if not more.

Presidio has generally advanced litigation positions that, if not always successful, were almost uniformly colorable. Critically, Presidio notched several notable victories throughout the case.  Plaintiffs originally claimed infringement of United States Patent No. 6,992,879 ("'879 Patent"), but Presidio successfully voided all claims relating to the '879 Patent in IPR, as well as Claim 1 of the '791 Patent.  Presidio obtained another favorable result in the *Daubert* Order, which precluded Plaintiffs' damages expert, Dr. Woods, from opining on a specific royalty rate at trial.  Then, at trial, Presidio

28

persuaded the jury to deliver a highly favorable damages verdict.  The jury awarded Plaintiffs zero lost profits, even though Plaintiffs sought almost $19 million by that measure.[7]  In addition, the jury found that Presidio did not willfully infringe the Patents-in-suit, removing the specter of enhanced damages, and rendered an advisory verdict finding the term "negligibly over a top surface of said device body" indefinite.[8]  Presidio also emphasizes, without dispute, that during the life of this case, "there were no motions to compel, no discovery sanctions, . . . no allegations that evidence was altered in an improper manner," and "timely compli[ance] with all of the Court's deadlines, including those pertaining to expert discovery and trial."  (Def.'s Opp. 1.)[9]

---

[7]   Although the jury's royalty verdict is due to be re-tried, the lost profits verdict stands.  (*See* ECF No. 237.)

[8]   As noted above, the court subsequently discarded the advisory verdict and held, as a matter of law, that the claim term was not indefinite.  (ECF No. 214.)

[9]   Exceptionality often lies where litigation, at conception, was motivated by extortive factors, but Plaintiffs have not otherwise attributed any foul motives to Presidio.  *See Eliya, Inc. v. Steven Madden, Ltd.*, No. 15CV1272DRHSIL, 2019 WL 5694315, at *6 (E.D.N.Y. Aug. 5, 2019), *report and recommendation adopted*, No. CV151272DRHSIL, 2019 WL 4593451 (E.D.N.Y. Sept. 23, 2019) ("[U]nlike many cases in the Second Circuit and elsewhere where an exceptionality finding was made in light of various plaintiffs' exploitive attempts to extract nominal settlements through serial litigation, such circumstances do not exist here."). *See, e.g., Hockeyline, Inc. v. STATS LLC*, 2017 WL 1743022, at *5 (S.D.N.Y. Apr. 27, 2017) ("The need for the deterrent impact of a fee award is greater when there is evidence that the plaintiff . . . has engaged in extortive litigation.") (citations omitted); *Auto-Kaps, LLC v. Clorox Co.*, No. 15-cv-1737, 2017 WL 6210846, at *3 (E.D.N.Y. Mar. 27, 2017), *aff'd*, 715 F. App'x 1025 (Fed. Cir. 2018) (declining to find a case exceptional where the record did not indicate that the plaintiff was "the type of serial filer that vexatiously litigates to extract nuisance-value settlements").

To be clear, Presidio's generally commendable conduct throughout the case does not excuse otherwise unreasonable behavior elsewhere in the case, particularly during the jury trial. "[A] district court has discretion, in an appropriate case, to find a case exceptional based on a single, isolated act." *Intellectual Ventures I LLC v. Trend Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019). But the Supreme Court has also made clear that the court's assessment of a single, isolated act, ought not be divorced altogether from the case's broader context. Rather, "[t]he district court must determine whether the conduct, isolated or otherwise, is such that *when considered as part of and along with the totality of circumstances*, the case is exceptional . . . ." *Id.* (quoting *Octane Fitness*, 572 U.S. at 554) (emphasis added). This mandate derives from the plain text of § 285, which preconditions attorneys' fees awards on a showing that the *case* itself was exceptional, and not merely the defeated adversary's discrete act, or set of acts.

Just last year, the Federal Circuit crystallized this point in *Intellectual Ventures I LLC v. Trend Micro Incorporated*, an appeal of a district court order awarding defendant attorneys' fees after prevailing at trial. The award centered principally on the plaintiff's expert, who changed his opinion at trial, and claimed he reversed course based on his preparation with plaintiff's trial lawyers. *Id.* at 1382.

30

Plaintiff lost at trial, but asserted post-trial that the expert had not actually changed his opinion, despite clear testimony to the contrary. *Id.* Although the district court did not find the case exceptional overall, defendant was awarded attorneys' fees "solely with respect to this collection of circumstances regarding [its expert's] changed testimony." *Id.* (record citation omitted).

The Federal Circuit vacated the award in *Intellectual Ventures*, and explained that:

> [C]ourts frequently award attorney fees under § 285 in an amount related to particular conduct and circumstances that stood out and made a case exceptional, even when the entirety of the conduct in the case was not exceptional from start to finish. . . . For example, . . . we [have] explained that after determining that a case is exceptional, a court must award fees in an amount that "bear[s] some relation to the extent of the misconduct." But in all such cases we have required a finding of an exceptional case—*not a finding of an exceptional portion of a case*—to support an award of partial fees. Because the district court did not find that the case overall was exceptional, we vacate its finding of exceptionality under § 285.

*Id.* at 1384 (emphasis in original).

Taking stock of Presidio's litigation position, and general conduct over nearly six years, the court now considers Presidio's isolated transgressions, and whether they warrant an award of fees under the totality of circumstances.

**B. Manner in Which the Case Was Litigated**

As noted above, the court may exercise its discretion to find the case exceptional based on isolated acts, although the Federal Circuit urges a more holistic view of the entire case. Based on the factors set forth by *Octane Fitness* and its progeny, the court does not find Presidio's discrete transgressions merit an award of fees. At the outset, Plaintiffs challenge only two pre-trial actions by Presidio. The remainder concern Plaintiffs' sustained trial objections.

1. Claim Construction

It became clear during summary judgment that a proper construction of "terminations" was essential to determining whether the accused products have "substantially L-shaped terminations," and whether the accused devices' terminations extend "negligibly over a top surface." (SJO 46-48.) Presidio contended that Plaintiffs' infringement theory was contingent on defining "terminations" to include external electrodes, or surface pads, which are located at the bottom of the accused device, *i.e.*, the lower portion of the "L." (*Id.* 46.) Presidio asserted that the deposition testimony of Plaintiffs' engineers and Dr. Randall belied such an expansive definition. Presidio also implied that the "dipping process" used for the accused devices, which was not used to apply surface pads, constituted the sole means for applying terminations in the accused devices.

32

(*Id.* 47.)  Plaintiffs asserted that surface pads were indeed part of the termination structure, relying on Dr. Hillman's expert report in support.  (*Id.*)

The annotated image from the '547 Patent, below, illustrates the stakes of the dispute.  It depicts an accused capacitor, in which the red marking signifies the surface pads, and the yellow marking reflects the portion of termination material not in dispute:



(Pls.' Mot. 1-2 (annotated cross-sectional image of a Presidio BB capacitor).)  Presidio's construction of "terminations" would have omitted the red marking (*i.e.*, surface pads) from the termination structure, thereby rendering the termination substantially "C-shaped" or "U-shaped," but not "L-shaped." (*See* SCCO 3 ("According to defendant, the surface pads cannot be considered part of the termination structure, and therefore must be disregarded in determining whether the terminations are substantially L-shaped.").)

Likewise, Presidio's favored construction would have brought the accused devices' top configuration into parity with the bottom configuration.  In other words, according to Presidio, the accused product's "termination" would not extend "negligibly over a top surface," as the '547 Patent requires. Thus, Presidio's construction would have been fatal to Plaintiffs' theory of infringement regarding the '547 Patent. Given the stakes, the court felt impelled to refrain from construing "terminations" without developing a record that could help determine its plain and ordinary meaning.  (*Id.* 52.) Ultimately, the court adopted Plaintiffs' construction, incorporating surface pads into the scope of "terminations," (*see* SCCO), and denied Presidio's successive motion for summary judgment.

As an initial matter, the Federal Circuit has observed that it is not uncommon for the court to construe a term in a patent litigation, "only to have [the parties] dispute evolve to a point where they realize that a further construction is necessary."  *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014).  Here, at summary judgment, the parties could only point the court to two items of information in the record, both from the *Markman* hearing, that elucidated the "plain and ordinary meaning" of "terminations": Dr. Shanfield's statement that terminations are "the things at the

34

ends of the capacitor," and Dr. Randall's testimony that
electrodes are connected to the termination end.  (SJO 50.)  The
court declined to construe the term on such a bare record, and
concluded that *both* parties had "put the proverbial cart, *i.e.*,
determining whether the accused products practice a limitation,
before the horse, *i.e.*, properly construing that limitation."
(*Id.*)

        Notwithstanding, Plaintiffs allege that Presidio knew
in early 2015 that it would be necessary to interpret
"terminations" to avoid infringement (*see* Pls.' Mot. 1-2), but
for reasons never stated or surmised, did not pursue a
construction of the term.  The smoking gun, Plaintiffs imply,
lies in Plaintiffs' April 15, 2015 response to Presidio's
Interrogatory No. 11, regarding infringement.  There, Plaintiffs
identified cross-sectional images of capacitors to show that
Presidio's BB capacitors have the "substantially L-shaped
terminations" claimed in the '547 Patent.  (*Id.* 1; ECF No. 223-
3, Plaintiffs' Responses to Presidio's First Set of
Interrogatories, No. 11.)  Among the images Plaintiffs produced
was Bates No. ATC001167, annotated above.  But, whereas the
annotated image of the capacitor specifically designates the
surface pad in red marking, the image Plaintiffs actually
produced on April 15, 2015, is not nearly so conspicuous:



(ECF No. 223-4.)  In other words, the court does not think the exemplar Plaintiffs produced in 2015 was so overt, that it may be presumed Presidio *knew* the accused device's termination structure included the capacitor's surface pads.

As Presidio also notes, Plaintiffs' discovery response did not explicitly state that "terminations" comprised external pads.  (Def.'s Opp. 14.)  Though this is true, literally speaking, it does not to rule out the possibility that Presidio may have known that "terminations" included surface pads, nor does it absolve Presidio for failing to make that deduction. Nevertheless, the court declines to impute to Presidio the knowledge that Plaintiffs presume, as it would require improper speculation.  *Cf. Pragmatus Telecom LLC v. Newegg Inc.*, No. CV 12-1533-RGA, 2016 WL 675529, at *3 (D. Del. Feb. 18, 2016) (court "decline[d] to find a nefarious motive" for purposes of § 285, "as doing so would require a quite speculative inference.").

Plaintiffs further argue that Presidio failed to identify "terminations" as requiring construction when the parties exchanged claim terms and proposed constructions on October 30, 2015. (Pls.' Mot. 2.) In addition, Plaintiffs detected the "latent claim construction dispute" with respect to "terminations" in their first claim construction reply, insisting the matter "should be addressed" at the time of the first *Markman* hearing. (*Id.* 2-3.) According to Plaintiffs, the blame for this lapse ought to fall squarely on Presidio's shoulders, for remaining silent at the August 2016 *Markman* hearing.

Plaintiffs neglect to explain, however, why the fault for not seeking an earlier construction of "terminations" should lie exclusively with Presidio. Just as Presidio failed to identify "terminations" for construction when the parties initially exchanged terms, so too did Plaintiffs. Plaintiffs credit themselves with identifying the potential claim construction dispute in a reply brief. The question begs, what further steps did Plaintiffs take to have the issue addressed at the first *Markman* hearing, and decided in the First Claim Construction Order, in order to avoid a second round of claim construction? None, at least as far as the court is aware. The hearing transcript contains only vague allusions to the issue, but no overt pursuit of the matter by Plaintiffs, which is

37

surprising given that Plaintiffs supposedly recognized how
critical the construction of "terminations" was to the case.
Plaintiffs identify no other efforts to bring this "latent"
dispute to the fore prior to summary judgment.

 "In considering the totality of the circumstances in a
[s]ection 285 analysis, the court can consider the conduct of
the movant[.]" *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107,
122 (E.D. Tex. 2017) (citing *Gaymar Indus., Inc. v. Cincinnati
Sub-Zero Prod., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015)); *see
also Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1415
(Fed. Cir. 2004) (affirming denial of fees where district court
"credited each of the parties with some share of the bad
behavior" and reasoned that an award would "tend to reward other
wrongdoers."). Here, Plaintiffs took a lackadaisical approach
to construing "terminations," and failed to meaningfully pursue
the matter prior to summary judgment. Presidio should not bear
sole responsibility for the resulting eight-month delay. Here,
the fault appears to be mutual.

 In support of their motion, Plaintiffs cite *Hunter
Douglas, Inc. v. Great Lake Woods, Inc.*, an "illustrative" case
in which the plaintiff was awarded fees from a defendant who,
among other things, failed to identify two claim terms for
construction. No. 15-CV-00106-REB-KLM, 2019 WL 1375675, at *1
(D. Colo. Mar. 27, 2019). In *Hunter*, defendants initially

38

identified 13 claim terms that purportedly required construction, and proposed that the terms "front tilt cord" and "rear tilt cord" be construed as "front tilt cables" and "rear tilt cables." *Id.* at *15. Yet defendants never actually sought construction of "front tilt cord" or "rear tilt cord." *Id.* At trial, however, defendants contested the meaning of these terms. *Id.* Thus, *Hunter* may be readily distinguished from this case as an instance where the defendant clearly knew, and affirmatively acknowledged, that certain terms were ripe for construction, but still allowed a latent dispute to fester until trial, causing needless delay. The blame, therefore, was appropriately placed squarely on the *Hunter* defendants' shoulders.

The claim construction lapse in *Hunter* was also just the tip of the iceberg of defendants' misconduct. Defendants' myriad transgressions coalesced to make the case exceptional: defendants had no objectively reasonable basis to contend they did not infringe; made no effort to understand the underlying patent they were accused of infringing; failed to proffer any significant evidence to support their non-infringement defense; pursued a legally untenable and objectively meritless invalidity claim; and left the court with the overall impression that defendants were strategically protracting the litigation to force their adversary to spend more money. *Id.* at *15-16. The

totality of the circumstances thus warranted an exceptionality
finding in *Hunter*.  The facts here are not comparable.

### 2. *Daubert* Motion

Plaintiffs find two faults with Presidio's
unsuccessful challenge to Dr. Hillman's opinions.  First,
Plaintiffs contend that Presidio lacked any basis to argue that
Dr. Hillman's infringement opinions were based on
unrepresentative samples.  (Pls.' Mot. 12.)  Second, Plaintiffs
decry Presidio's "specious assertion" that Dr. Hillman's
infringement opinions for the '791 Patent were insufficient and
unreliable based on Dr. Hillman's purported failure to measure
the length and width of the dielectric layers for each BB
capacitor, without accounting for local defects and corner-
rounding.  (*Id.* 14.)

Presidio's *Daubert* challenge did not represent the
finest lawyering.  Presidio's argument relied, largely, on
efforts to squirrel its way out of representations it made to
Plaintiffs, and which Plaintiffs reasonably relied on.
Plaintiffs requested samples of every accused product throughout
discovery, and with each production Presidio represented that
the samples it produced were "representative."  (*See, e.g.*, ECF
No. 223-5, Presidio's Responses to Plaintiffs' First Set of
Requests for Production of Documents and Things, dated April 15,
2015, at 9; ECF No. 223-6, Presidio's Responses to Plaintiffs'

Second Set of Requests for Production of Documents and Things, dated September 7, 2016, at 3-4.)  Presidio then belatedly sought to "clarify" its representations, perhaps recognizing that its unsolicited description of the capacitors as "representative" made it all the easier for Plaintiffs' expert to render an infringement opinion.

Presidio's correspondence in 2017 was a prelude to its *Daubert* motion argument that "each capacitor within a given lot is so different that an [infringement] analysis of one or two cannot form the basis of an opinion as to the remainder of the lot." (*See Daubert* Order 40.)  In a letter to Plaintiffs, dated January 4, 2017, Presidio proclaimed that "representative samples" did not mean "the samples that have been produced are the same in all respects as other capacitors." (ECF No. 224-24, Letter from Brett A. Schatz, Esq. to Brad M. Scheller, Esq., dated Jan. 4, 2017, ECF pp. 2-4.)  Two weeks later, Presidio tried again to disclaim its use of the word "representative." (*Id.*, Letter from Brett A. Schatz, Esq. to Brad M. Scheller, Esq., dated Jan. 17, 2017, ECF pp. 5-7.)  Presidio's disavowals continued into February. (*E.g., id.*, Email from Brett Schatz, Esq. to Brad M. Scheller, Esq., et al., dated Feb. 22, 2017, ECF p. 8.)  Throughout, Plaintiffs steadfastly, and reasonably, held Presidio to its earlier representation.

The dispute boiled over in *Daubert* briefing, and the related hearing, as Presidio persistently maintained that Dr. Hillman's failure to test a sufficient sample size of capacitors rendered his infringement opinion fatally deficient.  At the *Daubert* hearing, however, the flimsiness of Presidio's assertion became manifest.  Plaintiffs highlight the following exchange as emblematic of Presidio's frivolous argument:

> **The Court:** Did you represent that they were representative samples of your product?
>
> **Defense Counsel:** No. No. I will say, as they requested ten capacitors in this case size, a statement in the response to production said: Representative samples have been sent. Then there was a dispute over what that meant. We made it very clear that it did not mean that they were the same as all the other capacitors, nor –
>
> **The Court:** What did you mean by representative samples?
>
> **Defense Counsel:** You know, nothing. Actually, it was we are handing over—
>
> **The Court:** You are just a lawyer who uses words that mean nothing? I mean, you are representing in a federal court litigation that you are sending representative samples but that word didn't mean anything? Seriously?
>
> **Defense Counsel:** Your Honor, we made it very clear, in response to interrogatories, that that did not mean that they were the same.
>
> **The Court:** What did it mean?
>
> **Defense Counsel:** Your Honor, to be honest, we were just saying here's samples and the word "representative" did not mean they are exactly the same in every aspect, and that became a dispute

amongst the parties and we made it very clear, and
that led to the production of more capacitors.

**The Court:** Okay, what else do you have? Let's wrap
this up.

(ECF No. 223-10, Transcript of *Daubert* Hearing, held May 7,
2019, Tr. 72:22-73:10.)  The *Daubert* Order closed the door on
this "unpersuasive line of attack," rejecting Presidio's
challenge to Dr. Hillman's opinion, and with it, Presidio's
"attempts to construe plaintiffs' relevant discovery requests as
seeking documents concerning '*why each and every capacitor is
different*.'"  (Daubert Order 40-42 (emphasis added).)

The court wants to be clear: Presidio's attempt to
renege on its own admissions merits rebuke.  And if § 285
authorized the award of fees based on "exceptional arguments" or
"exceptional motions," intended to sanction any foolish act, the
court might well have granted Plaintiffs' motion.  But it does
not.  The court must consider Presidio's conduct in the broader
context of the case, and even the *Daubert* motion itself, under
the totality of the circumstances.  In addition to Presidio's
otherwise professional conduct throughout the litigation,
mitigating factors militate against an exceptionality finding.
First, although Presidio's arguments may have been objectively
unreasonable, it does not appear that dilatory or pernicious
motives were at play.  Presidio began disavowing its admission
in January 2017, three months before Dr. Hillman completed his

43

expert report.  (*See* ECF No. 146-2, Expert Report of Dr. Craig Hillman, dated April 19, 2017.)  There was thus sufficient time for Plaintiffs to apprise Dr. Hillman of Presidio's disavowal, and for Dr. Hillman to account for Presidio's contention before serving his expert report.

Second, Presidio advanced other, more colorable lines of attack against Dr. Hillman's opinion.  For instance, Presidio challenged Dr. Hillman's opinion that the accused devices feature "co-extensive" first and second dielectric layers, as disclosed in the '791 Patent.  In a Request for Admission, regarding an image of an accused device, Plaintiffs asked Presidio whether "the length and width dimensions of the dielectric material" above the capacitor's electrode were "co-extensive" with the corresponding dimensions for the dielectric material below the electrode.  (ECF No. 223-7, Presidio's Responses to Plaintiffs' First Set of Requests for Admissions, dated Sept. 5, 2015, at 20-21.)  Presidio replied, "Admitted." (*Id.*)  Later, however, Presidio contended that its admission only applied to the specific dimensions displayed in the image, but that "if there is a point along the width of the capacitor where the width of the second dielectric layer is different than that of the first dielectric layer, then the widths of the two layers would not be coextensive."  (*Daubert* Order 54.)

Although Presidio's *Daubert* challenge was undone by
this admission, it was at least arguably plausible that Presidio
did not expect its concession concerning a single capacitor to
apply to each and every device accused of infringing the '791
Patent.  Critically, neither the RFA nor Presidio's response
affirmatively stated the capacitor was "representative" of other
capacitors in the same lot.  Presidio certainly promoted a weak
argument, and if Presidio believed additional data points were
required to fairly assess the "co-extensive" requirement, its
counsel should have crafted its discovery responses with more
precision.  But not every instance of shoddy lawyering merits
sanction, or makes a case exceptional.  Effective and zealous
advocacy sometimes requires attorneys to modify their case
theory, and cabin prior representations.  That is essentially
what Presidio tried to do here, albeit unsuccessfully.  The
court does not find that a single motion, even an exceedingly
weak one, warrants an exceptionality finding, absent
demonstrably foul motives, significant prejudice, or other
aggravating circumstances identified by the Supreme Court in
*Octane Fitness*.

Moreover, Presidio's less colorable *Daubert*
arguments should not be considered in isolation, but rather in
tandem with Presidio's successful challenge to Dr. Woods' expert
opinion.  In granting Presidio's motion to strike Dr. Woods'

45

reasonable royalty opinion, the court concluded that Dr. Woods'
treatment of Plaintiffs as a single entity for the purposes of a
hypothetical licensing negotiation, *see Georgia-Pacific Corp. v.
U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970),
"could not be untangled in a reliable way." (*Daubert* Order 71-
72.) Presidio thus secured a critical victory: the court deemed
Dr. Woods' royalty rate conclusion inadmissible. (*Id.* 73.)

Third, Plaintiffs cite no authority reasonably
susceptible to supporting an exceptionality finding based on a
single errant motion. For example, Plaintiffs rely on
*AdjustaCam, LLC v. Newegg, Inc.*, in which the Federal Circuit
reversed a denial of the defendant's § 285 motion. 861 F.3d
1353, 1361 (Fed. Cir. 2017). The Federal Circuit held it was
error for the district court to deem the case unexceptional even
though "no reasonable factfinder could conclude that
[defendant's] products infringe." *Id.* The Federal Circuit also
found that the case was litigated in an unreasonable manner
because plaintiff, among other things, repeatedly used after-
the-fact declarations, served a new expert report on defendant
the day of that expert's deposition, and filed supplemental
declarations making new infringement arguments for the first
time to the Federal Circuit on appeal. *Id. Adjustacam* is
clearly distinguishable. The non-movant not only maintained an
untenable position, unlike Presidio, but also sandbagged its

46

adversary by serving a last-minute expert report.  Here, Presidio disavowed its position three months before Dr. Hillman served his expert report, which indicates non-dilatory motives.

Plaintiffs also cite *BroadSoft, Inc. v. CallWave Communications, LLC*, a non-controlling opinion decided in the Delaware District Court.  2019 WL 3750817, at *1.  The *Broadsoft* court generally observed that "[c]ourts imposing exceptional case status due to litigation conduct generally find that the nonmoving party took positions contrary to its own evidence or prior statements," but concluded the record before it did not support a fee award for plaintiff because defendant only modified its contentions in response to the plaintiff's own supplementation of the record, and maintained an overall reasonable litigation position.  *Id.* at *6.  *Broadsoft* based the above observation on two other cases, but each one, in turn, merely reinforces the need to assess the non-movant's litigation conduct in totality, rather than at its nadir.  First, in *Bayer CropScience AG v. Dow AgroSciences LLC*, the Federal Circuit found the district court had not abused its discretion by granting defendant fees under § 285.  851 F.3d 1302 (Fed. Cir. 2017).  The district court principally based the fee award on Bayer's failure to conduct a diligent pre-suit investigation, "at least of its own easily-obtainable evidence," which, would have made plain the futility of its lawsuit.  *Id.* at 1307.

47

Bayer's whole case was buttressed by a contract interpretation that was "directly contradicted" by evidence obtained through early discovery, and a pre-suit investigation would have uncovered that "no witness supported Bayer's construction." *Id.* at 1305. *Bayer CropScience* therefore belongs in an entirely separate category than this case. The former litigation would not have been filed but for Bayer's assertions in contradiction to the record. Presidio's disavowal of its prior admission was one, dubious act, in an otherwise colorable, and partially successful motion, and part of an overall meritorious defense.

The other case cited in *Broadsoft*, *Intendis GmbH v. Glenmark Pharms. Ltd.*, actually undermines Plaintiffs' contention. 117 F. Supp. 3d 549 (D. Del. 2015). Intendis, as the prevailing party in a patent infringement suit, sought fees for, among other things, defendants' repeated shifting of positions on key issues throughout the litigation, including positions that were contrary to expert testimony and its own prior statements. *Id.* at 581. The court rejected Intendis' § 285 application, however, finding that even if "some of defendants' arguments were unsupported or contradictory," their conduct did not rise to the level of "exceptional." *Id.* The court particularly noted the "considerable efforts" needed to reach an infringement determination, suggesting "that defendants were [not] so lacking a good faith belief of non-infringement as

48

to merit" an award of fees under § 285. *Id.* Likewise, taking into account Presidio's questionable *Daubert* argument, this case does not rise to the level of exceptional, given Presidio's apparently good faith conduct throughout the balance of the litigation.

### 3. Trial Objections

On balance, Presidio's trial behavior does not warrant fee-shifting, though it came close. Although Presidio pushed boundaries to the point where the court discussed—but did not impose—sanctions, defense counsel's conduct was not so vexatious or lacking in good faith as to make this case exceptional.

Plaintiffs list a series of infractions that appeared to defy the court's orders. For example, the court sustained Plaintiffs' objection to the introduction of defense Exhibit FD, a patent of a Presidio capacitor from the early 1990s, based on the pre-trial Estoppel Order, which prohibited Presidio from supplementing its invalidity contentions. Plaintiffs accused Presidio at sidebar of attempting to end-run around the Estoppel Order, but defense counsel denied the charge, claiming the document was introduced solely to establish Presidio's experience with certain terminations. After Plaintiffs' objection to Exhibit FD was sustained, Presidio's witness, who was not present at the sidebar, commented on the prior art reference in the very exhibit that had been excluded just

moments prior, prompting an immediate objection from Plaintiffs'
counsel.  Although the court mentioned the possibility of
sanctions at the time, in retrospect, it is less than clear that
defense counsel intentionally elicited the objectionable
testimony from the witness.  Counsel appears to have been
inquiring about Presidio's experience with three-sided
terminations broadly, which, apparently prompted the witness to
mention the patent in Exhibit FD.  Presidio's counsel should
have prepared the witness not to violate the Estoppel Order and
prefaced his question by warning the witness not to mention the
specific exhibit that had just been precluded.  But defense
counsel's lapse is more suggestive of carelessness than
intentional defiance of the court's rulings.

Defense counsel also skated on thin ice in his opening
statement, when he remarked that "negligibly" refers to
something that can be neglected.  Plaintiffs' counsel asserted
at trial that this was an improper attempt to reconstrue the
term "negligibly," as relating to neglect or neglectful
behavior.  The court agreed, but refrained from a curative
instruction, choosing instead to clarify matters in its final
instructions to the jury.  Elsewhere, defense counsel inquired
about the specific measurements of the top termination material,
prompting Plaintiffs to object that Presidio was conflating
"negligibly" with a determinate numerical limitation, a

construction rejected by the court.  These objections were
sustained, but Presidio asserted that questions concerning the
top termination's numerical limits were asked, not for the
purpose of challenging infringement, which the First Claim
Construction and *Daubert* Orders forbade, but rather, for the
permissible purpose of advancing Presidio's indefiniteness
contention.  Presidio even elicited testimony from its own
witness that the numerical limitation had no bearing on
infringement, lending some credence to Presidio's good faith.
Though the court issued a curative instruction to avoid juror
confusion, it did not necessarily do so as an indictment of
counsel's behavior.

Presidio perhaps strayed closest to a direct violation
of the court's orders when it introduced a damages report from
the California Litigations.  The MIL Order expressly precluded
Presidio from introducing evidence or eliciting testimony
regarding Presidio's earlier cases against ATC in the Southern
District of California.  While cross-examining Dr. Woods
regarding his lost profits opinion, defense counsel introduced
the damages report, purportedly to show that Dr. Woods made a
prior inconsistent statement about ATC's profits per unit for
given capacitor.  But even if the document contained a prior
inconsistent statement, the document was not admissible.
Presidio also assured Plaintiffs and the court that any

reference to the California Litigations was removed from the exhibit, and that defense counsel would not ask Dr. Woods about the document's origins.  On the one hand, Presidio's reliance on semantics to evade the MIL Order suggests a degree of insincerity.  On the other hand, the issue was resolved with a brief sidebar, and Plaintiffs incurred no prejudice.

The court does not take issue with Presidio's line of questioning concerning the "substantially L-shaped terminations" limitation in the '547 Patent.  The First Claim Construction and *Daubert* Orders generally precluded testimony and argument that the presence of termination material on the lateral sides of the capacitor barred infringement *per se*, but they did not altogether bar evidence of termination material on the lateral sides.  At trial, Presidio inquired about Figure 2 of the '547 Patent, depicting a "substantially L-shaped termination," first while cross-examining Dr. Hillman, and then on direct examination of Dr. Randall.  Plaintiffs objected each time, concerned about the implication that lateral termination material was incompatible with the "substantially L-shaped termination" limitation.  Defense counsel insisted he was simply eliciting testimony to support Presidio's indefiniteness defense, and also that lateral termination material was potentially probative of infringement.  Even though Plaintiffs' objections were sustained, the court's ultimate curative

52

instruction incorporated the very caveats noted by Presidio. The court sees no reason to construe the relevant conduct as anything other than zealous advocacy.  If anything, the sequence of objection, sidebar, and curative instruction adhered to appropriate trial practice.  Plaintiffs' counsel, advocating for its own clients, rightly worried that that the jury could misinterpret the testimony Presidio sought to elicit, and objected.  Confronted by equally colorable arguments, the court took the step most likely to mitigate error by the jury. Nothing in this sequence implicated Presidio as a bad faith or unreasonable actor.  *See RMH Tech LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 206 (D. Conn. 2018) ("A patentee's vigorous prosecution of its property rights or an accused infringer's dogged defense of its product should not result in a finding that a case is exceptional as a matter of course.")

Finally, the court has considered Plaintiffs' miscellaneous allegations of trial misconduct.  Plaintiffs scarcely explain how the documented "misconduct" is anything other than commonplace, adversarial trial practice.  Having undertaken an independent review of the record, the court finds nothing particularly untoward, much less exceptional, about defense counsel's trial conduct, notwithstanding the unfortunate need to conduct numerous sidebars.

<u>**CONCLUSION**</u>

For the foregoing reasons, the court DENIES Plaintiffs' Motion for Attorneys' Fees. Plaintiffs have failed to demonstrate that this was an exceptional case, either with respect to the substantive strength of Presidio's litigating position, or its conduct throughout the case. Accordingly, there is no need to determine the amount of fees justified. Defendant is advised that the court may revisit the issue of fee-shifting should Defendant persist in certain questionable conduct and practices, of the nature discussed herein, both leading up and during the new trial.

**SO ORDERED.**

Dated:    September 23, 2020
          Brooklyn, New York

                                        /s/
                          _____
                          Kiyo A. Matsumoto
                          United States District Judge